**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIFE'S FORTUNE LLC successor to NEKTAR NUTRITION INC, OWELL NATURALS BRAND, LLC F.K.A. E-TOLLS LLC, and MOSHE ZAHLER a.k.a. MOSES ZAHLER,<br><br>       Plaintiffs,<br>  -against-<br><br>SERENU INC., JOSEPH STERN, SHAYA WERZBERGER a.k.a. VOLVIE WERZBERGER a.k.a. SAM WERZBERGER, and SHMUEL MAYER ROTH,<br><br>      Defendants. | Civil Action No.: 24-cv-05066<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs, LIFE'S FORTUNE LLC successor to NEKTAR NUTRITION INC. ("Life's Fortune"), OWELL NATURALS BRAND, LLC f.k.a. E-TOLLS LLC ("Owell"), and Moshe Zahler also known as Moses Zahler ("Zahler") (collectively, "Life's Fortune" or "Plaintiffs"), by their attorneys, BRUCK LLP, as and for their Complaint ("Complaint") herein, upon both personal knowledge and upon information and belief, and as against SERENU, INC. ("Serenu" or the "Corporate Defendant"), Joseph Stern ("Stern"), Shaya Werzberger a.k.a. Volvie Werzberger a.k.a. Sam Werzberger ("Werzberger"), and Shmuel Mayer Roth ("Roth") (collectively, the "Individual Defendants" and together with Serenu the "Defendants") aver and alleges the following:

**NATURE OF ACTION**

1.  This case arises from the brazen, egregious, and deliberate actions taken by the Individual Defendants both during and following the time during which they were employed by Plaintiffs.

1

2.       In particular, Plaintiffs reposed trust and confidence in the Individual Defendants, each of whom achieved substantial success and financial gain through their employment by Plaintiffs.

3.       As discussed in more detail herein, however, the Individual Defendants took significant and unlawful advantage of that trust, by, among other things, misappropriating substantial proprietary confidential information and trade secrets from Plaintiffs, diverting Plaintiffs' corporate opportunities for their own gain, utilizing Plaintiffs' products' trade dress, registered trademark, trade secrets and resources to launch, while still under the employ of Plaintiffs and continuing until today, an illicit competing business with substantially similar and/or nearly identical products directly competing with those marketed by Plaintiffs for their own financial benefit, and to Plaintiffs' extreme detriment.

4.       The Individual Defendants also made numerous fraudulent statements to Plaintiffs, its employees, vendors and other strategic partners, and the retailers on whose platforms Plaintiffs relied on to continue operating its business.  The representations made by the Individual Defendants, which included the sinister use of false aliases and fraudulently pretending to act on Plaintiffs behalf, allowed them and the Corporate Defendant through which they orchestrated their scheme to steal Plaintiffs' customer lists, product formulas, and other critical commercialization strategies.

5.       In fact, Plaintiffs' investigation, which is yet in its beginning stages, has revealed that Defendants have been conspiring for many years, in a scheme to completely undermine Plaintiffs' business and enrich themselves at the expense of the company and Zahler who put their utmost trust in the Individual Defendants.

6.       For years, Plaintiffs helped the Individual Defendants flourish and grow professionally and personally throughout their employment, which each earning salaries that

2

increased to $150,000 per year as well as other benefits, compensation and bonuses.

7.      However, rather than reciprocate with their loyalty, the Individual Defendants operated with greed and impunity, seeking to take for themselves all they could from Plaintiffs, unfettered by (and entirely unconcerned with) moral, ethical or legal considerations.

8.      The  Individual Defendants accomplished this by effectively launching a corporate espionage and sabotage gambit from within the confines of Plaintiffs' corporate headquarters, which it used to create directly competing brands with the sinister purpose of ruining Plaintiffs and siphoning off its corporate opportunities.

To make matters worse, the Individual Defendants took significant steps to cover the full extent of their debauchery. Once they realized their scheme had been discovered, they sought and continue to seek to depravingly extort Zahler by propagating completely fabricated claims of sexual misconduct by Zahler. Werzberger retained the services of an attorney named Allen Lowy who demanded $10,000,000 from Zahler to compensate Werzberger and to keep him from going public and pursuing legal action for his claims of sexual harassment and rape allegedly committed by Zahler. These allegations were completely false and were manufactured from whole cloth as a devious tactic meant to harass, intimidate, bully and extort Zahler into submission and to prevent him from exposing the Individual Defendant's illicit corporate espionage scheme and competing business.

9.      By way of this action, Plaintiffs seek a permanent injunction, damages including defendants' profits, trebled under the law, punitive damages, and related relief as more fully described herein.

## PARTIES

**Plaintiffs**

10.      Plaintiff Life's Fortune LLC is a New York limited liability company with its principal place of business in Southfields, New York. Life's Fortune is solely owned by Moshe

Zahler, a resident of Monroe, New York. Life's Fortune owns and operates multiple brands in the health and beauty space, selling supplements, cosmetics, and over the counter products which are sold across the United States on Amazon, eBay, Walmart, other online platforms and brick and mortar establishments.

11.     Plaintiff Nektar Nutrition Inc. is a New York corporation with its principal place of business in Southfields, New York. Nektar is solely owned by Moshe Zahler, a resident of Monroe, New York. Nektar, including by and through its successor Life's Fortune, manufactures, promotes and sells a line of vitamins, supplements, cosmetics and over the counter (OTC) products that are sold on Amazon, eBay, Walmart, other online platforms and brick and mortar establishments.

12.     Plaintiff Owell Naturals Brand, LLC f.k.a. E-Tolls LLC is a New York limited liability company with its principal place of business in Southfields, New York. It is solely owned by Moshe Zahler who resides in Monroe, New York. Owell manufactures a line of vitamins, supplements and cosmetics and over the counter (OTC) products that are sold on Amazon, eBay, Walmart, other online platforms and brick and mortar establishments.

13.     Plaintiff Moshe Zahler is a natural person residing in Monroe, New York.


**Defendants**

14.     Defendant Joseph Stern is an individual who, at all relevant times, has been domiciled in Spring Valley, New York with an address at 38 N. Myrtle Ave # 303 Spring Valley, NY 10977. Stern was a key executive employee of Plaintiffs from 2016 to June 2023.

15.     Defendant Shmuel Mayer Roth is an individual who, at all relevant times, has been domiciled in Spring Valley, New York with an address at 3 Sunderland Place Suffern, NY 10901. Roth was a key executive employee of Plaintiffs from 2021 to December 2023.

16.     Defendant Shaya Werzberger a.k.a. Sam Werzberger, is an individual who, at all

relevant times, has been domiciled in Spring Valley, New York, with an address at 81 West Church St., Unit 101, Spring Valley, NY 10977.  Werzberger was a key executive employee of Plaintiffs from 2020 to December 2022.

17.     Defendant Serenu Inc. is a Delaware corporation with its principal place of business in Spring Valley, New York. It was created, and was and continues to be operated, and/or controlled by the Individual Defendants.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 29 U.S.C. §§ 1331 and 1338, with respect to the claims arising under the Lanham Act, 15 U.S.C. §1125, *et seq*., the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. 1962(c) and (d), and Computer Fraud and Abuse Act, 18 U.S.C. § 1030, etc.

19.     This Court has supplemental jurisdiction over all other claims under the laws of the State of New York and common law because they are so related to the claims in this action with the original jurisdiction of this Court that they form part of the same case or controversy.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims that are the subject of this action occurred in this District.

## FACTUAL BACKGROUND

### A.     Plaintiffs' Business

21.     Life's Fortune is a business that was incorporated in June 2021 by Zahler, and it succeeded Nektar Nutrition Inc. which had been established in 2013, which is the parent company of Owell Naturals Brand, LLC formerly known as E-Tolls LLC. Zahler was and still is the sole

owner and operator of all of these entities, and all operated in the same general industry.

22.     Plaintiffs have been engaged in promoting health and wellness to hundreds of thousands of customers through a product line consisting of nutrient-rich formulas containing a full spectrum of all daily essential line of vitamins, supplements, cosmetics and over the counter (OTC) products. These products are distributed and sold throughout the United States.  Plaintiffs manufacture, promote, market, and offer for sale their consumer goods through various e-commerce channels such as Amazon.com, eBay, Walmart, other online platforms and brick and mortar establishments via over thousands of retail stores.

23.     Plaintiffs' companies began as small businesses, have significantly grown through hard work, honest business practices, and smart commercial strategy has significantly grown over the years.

24.     Plaintiffs joined Amazon, progressively expanding its health and wellness product lines, especially in the vitamins and creams segments, and ultimately succeeded in obtaining a coveted "Vendor Central" status which facilitated direct sales to Amazon and was vital in securing Plaintiffs significant business opportunities.

25.     Plaintiffs' experience in the industry, their relationships, and their proprietary information and know-how relating to product formulas, pricing, costs, systems, and methods have allowed them to thrive in online retail sales.

26.     Plaintiffs achieved very substantial business success through their confidential and proprietary analytics and methods, which have allowed them to grow and successfully market, price, and source products for sale through their various sales channels.

**B.     <u>Stern's Employment by Plaintiffs</u>**

27.     In 2016, Stern approached Life's Fortune's predecessor, Nektar, seeking

employment. Stern was hired as a purchasing employee, initially earning approximately $50,000 annually plus bonuses for his work.

28.    Within the context of his employment, the parties entered into a written agreement dated May 16, 2016 (the "Stern Contract") whereby:

- Stern expressly agreed that he would "*not establish, open, be engaged in, finance, invest in, nor in any manner whatsoever become interested, directly or indirectly, as employee, owner, partner, agent…director, officer or otherwise, in any business, trade or occupation which competes with the business…..including…through any online, email or social networking media*" during his employment and for the five year period thereafter;

- Stern was expressly prohibited from disclosing information regarding the company to any third party without prior written consent; and

- Stern was forbidden to "use or permit to be used any such information in any fashion or manner detrimental to the interest" of the company.

29.    A few years later, Zahler promoted Stern to Purchasing and Marketing Manager. Subsequently, Stern asked Zahler for an increase in his salary, and in light of the good and valuable work Stern had done to date, Zahler acquiesced, ultimately increasing his salary to $150,000 per year. He also received thousands of dollars in bonus checks which were distributed prior to various holidays.

30.    Plaintiffs provided substantial training to Stern, especially after this promotion, instructing him on and giving him valuable access to important strategies on product and pricing formulas, as well as other information critical to Plaintiffs' success.  Indeed, Stern was provided unfettered access to Plaintiffs' valuable and confidential information, trade secrets and business know-how.

31.     Stern remained in his role until June 2023 when he departed from his employment by Plaintiffs.

32.     As detailed below, rather than respond reciprocally to the goodwill and success afforded to him by Plaintiffs, Stern chose to instead participate in an intricate scheme intended to steal from Plaintiffs, taking not only significant Company assets, but also the proprietary and confidential information he had been given to in order to benefit himself and his co-conspirators' through their launch of a directly competing business.

33.     Stern worked to substantially duplicate or mimic Life's Fortune's product formulas such as Draw Salve, Joint and muscle pain cream, Neuropathy Cream, and over 100 other product formulas, utilizing the same outsourced production facilities, marketing experts and other vendors as Plaintiffs.

34.     Stern partnered with Roth (Plaintiffs' CFO) and Werzberger to conduct a nefarious corporate espionage and sabotage campaign to launch Serenu, a directly competitive business, while still receiving a paycheck from Plaintiffs.

35.     Serenu was incorporated at the direction of the Individual Defendants in the State of Delaware.

36.     After Stern abruptly ended his employment with Plaintiffs in June 2023, despite repeated requests and demands by Zahler, he refused to return the password belonging to the company email "reportnupharma@gmail.com" (the "Email") for many months.

37.     This Email was invaluable to Plaintiffs because it would enable access to "Vendor Central" an Amazon platform which allowed Plaintiffs to sell their products directly to Amazon as a purchaser. Without this password, Plaintiffs were unable to access this Amazon platform.

38.     Plaintiffs lost a significant amount of business as a result of not having access to the Email.

39.     Only after an approximately *nine-month* period had passed since his departure from Plaintiffs' employment, did Stern finally relinquish the Email password back to Plaintiffs.

40.     However, when accessing the Email, Plaintiffs discovered that Stern had deleted *hundreds, if not thousands,* of emails.  In so doing, Plaintiffs were precluded from accessing important emails that had been exchanged while Stern had still been employed – and was still being paid – by Plaintiffs. The deleted emails included emails exchanged with manufacturers, customers, marketing specialists, graphic designers and formulas and other business affiliates.

41.     Stern engaged in this spoliation of important business records months after his employment with Plaintiffs had concluded, and after he was warned by Zahler not to tamper with these emails.

42.     When Stern finally returned Life's Fortune laptop, months after he left and only after repeated requests by Zahler, Stern had deleted all of Life's Fortune's data. The laptop was completely erased.

43.     Stern refused to return Life's Fortune's Samsung Galaxy phone, despite repeated requests and demands. To this date, this phone remains in Sterns possession

**C.     Roth's Employment by Plaintiffs**

44.     In 2020, Plaintiffs hired Roth to serve in the role of Chief Financial Officer.

45.     Roth's initial salary was set at or around $78,000. It was subsequently increased by Plaintiffs to $160,000, which was his annualized salary until he would later resign. He also received thousands of dollars in bonus checks which were distributed prior to various holidays.

46.     Roth received specialized training from Plaintiffs during the course of his employment and was given access to strategies and formulas relating to the pricing and marketing of Plaintiffs' products.  Likewise, Roth was exposed to Plaintiffs' trade secrets, business know-how and other confidential and proprietary information relating to the operation of the business.

47.     Within the context of his employment, Roth agreed to maintain the proprietary and confidential nature of the company's sensitive information, and to only use such information for the best interests of his employer. This was also an implicit condition to his continued employment and a necessary prerequisite to being provided the access he was given to this information.

48.     As CFO, Roth was given significant and substantial responsibility and discretion relating to the financial prospects of the company, including the purchase, marketing, and sale of the products. He was given wide discretion to negotiate with manufacturers, vendors and other stakeholders as to pricing and purchase of products sourced by Plaintiffs, as well as to the pricing and marketing of end-use products on Amazon and other online retailers.

49.     Roth resigned from his role as CFO in or around December 2023.

50.     Plaintiffs have since learned that Roth partnered with Stern and Werzberger to conduct a nefarious corporate espionage and sabotage campaign to launch Serenu, a directly competitive business,

51.     Roth had been manipulating Zahler's employees for his own benefit. For example, Plaintiffs have since learned that Roth also abused his power and trust to commit Medicaid fraud by enlisting, Michael Dillon, a subordinate employee of Plaintiffs to fraudulently submit time sheets to Medicaid (purporting to be a service provider for Roth's special needs child) so as to obtain more funding for his family's needs. Dillon would then pay Roth, in cash, for the amounts he had received from Medicaid for the purported services. Roth further required work relating to this scheme be done during working hours. In so doing, he not only diverted Plaintiffs' corporate resources to his own personal benefit, but exposed Plaintiffs and its employees to significant legal exposure.

52.     Upon information and belief, Roth continues to pay current employees of Zahler in exchange for trade secrets and other confidential information.

53.     In or about September 2023, Roth intentionally entered unauthorized keywords into the Amazon online platform causing Amazon to shut down one of Plaintiffs product listings. This was done intentionally and to harm the Plaintiffs. As a result, Plaintiffs lost over $500,000 in sales.

**D.     Werzberger's Employment by Plaintiffs**

54.     In 2020, Plaintiffs hired Werzberger as an Operations Manager.

55.     In this role, he had access to all of the company's manufactures, formulas, and served as the company "admin" for emails, sales channels (e.g. Amazon, Shopify, eBay, Walmart etc.) and over 4,000 health food stores.

56.     Werzberger's salary was initially set at $62,400 plus commissions based on milestones achieved. This was later increased to $100,000, with a bonus opportunity of up to an additional $50,000, thus resulting in $150,000 of annual compensation. He also received thousands of dollars in bonus checks which were distributed prior to various holidays.

57.     Werzberger received specialized training from Plaintiffs during the course of his employment and was given access to strategies and formulas relating to the pricing and marketing of Plaintiffs' products.  Likewise, Werzberger was exposed to Plaintiffs' trade secrets, business know-how and other confidential and proprietary information relating to the operation of the business.

58.     Within the context of his employment, Werzberger agreed to maintain the proprietary and confidential nature of the company's sensitive information, and to only use such information for the best interests of his employer. This was also an implicit condition to his continued employment and a necessary prerequisite to being provided the access he was given to this information.

59.     Werzberger resigned from his role at Plaintiffs' company in or around December 2022.

60.     Plaintiffs have since learned that Werzberger conspired with Roth and Stern to conduct a nefarious corporate espionage and sabotage campaign to launch Serenu, a directly competitive business, while simultaneously still receiving a paycheck from Plaintiffs.

61.     Upon information and belief, Werzberger stole from Plaintiffs warehouse multiple products, valued at thousands of dollars, owned by Plaintiffs' and kept in Plaintiffs warehouses, presumably in furtherance of Individual Defendants' scheme.

62.     Werzberger retained Lifes Fortune's laptop after he left and when he finally returned the laptop was all deleted.

63.     Werzberger refuses to return a Lifes Fortune email account despite repeated requests by Zahler. The email contains Zahler's trade secrets, customer list and other confidential information.

**E.      The Scheme**

64.     Upon information and belief, the Individual Defendants began their scheme to defraud, embezzle, and divert Plaintiffs' assets and corporate opportunities or their own financial gain at some point in 2022.  This included but was not limited to:

- deliberately duplicating Plaintiffs' product formulas and sources in order to create their competing (and in some cases, nearly identical) products;

- manipulating Plaintiffs' prices and marketing campaigns for their own benefit;

- developing new product names and brands for Serenu, rather than meeting their responsibility to pursue expansions of Plaintiffs' product lines;

- exploiting valuable relationships that had been developed by and for Plaintiffs, including with outside vendors, manufacturers, experts; and

- using plaintiffs' corporate resources and infrastructure including but not limited to telephones, computers, equipment – and even employees - to advance the launch of

Serenu.

65.     The Individual Defendants reached out to Plaintiffs' suppliers under false pretenses during business hours while they were employed by Plaintiffs. In reality, however, the Individual Defendants were reaching out to these third parties to source products for their own competing businesses and product lines.

66.     For example, on October 17, 2023, Individual Defendants created the fictitious name "Ethan Collins" for whom they obtained a separate telephone number. Through this alias, they contacted Hazma Mukhtar, Plaintiffs' trusted Graphic specialist, in order to enlist professional graphics services for Serenu.

67.     The Individual Defendants likewise reached out to other third parties to source products for their own competing businesses and product lines.

68.     During working hours for which they were paid by Plaintiffs, Individual Defendants drafted and developed work products, projections, campaigns and materials competitive to Plaintiffs, which they would then transmit to their personal email accounts.

69.     When new products and samples were pitched and presented for evaluation to Plaintiffs by outside vendors and manufacturers, Individual Defendants diverted these opportunities to their own business line.

70.     Individual Defendants contacted third parties and product sellers they met at conferences, trade shows, Amazon sellers' shows other meetings that they attended on Plaintiffs' behalf and time and solicited these parties for commercial information which they then used to advance their own products.

71.     Plaintiffs' investigation uncovered other incontrovertible evidence that the Individual Defendants were knee-deep in their scheme – including purchasing products from Plaintiffs' own vendors – while still under Plaintiffs' employ. For example, Plaintiffs learned of

two payments Individual Defendants had made from *Serenu's* Chase bank account on September 5, 2023 –at the very same time Roth was employed by Plaintiffs and was sending money on behalf of Plaintiff: One payment in the amount of $12,800 to a manufacturing company called Pure Source, and another in the amount of $3,500 to a graphics vendor called Arell Design. Plaintiffs had pre-existing relationships with *both* Pure Source and Arell.

72.     Upon information and belief, while ordering their own competing products from Plaintiffs' vendors, Individual Defendants also purposely caused the same vendors to delay their supply of products that had been ordered for Plaintiffs, thereby depressing Plaintiffs' sales while at the same time allowing the Individual Defendants' competing products to flourish.

73.     The Individual Defendants also sought and obtained samples from Plaintiffs' vendors, using Plaintiffs' name, address and representing that the samples were being sought for Plaintiffs, only to later commandeer these samples for Serenu. They also took samples already owned by Plaintiffs and sent them across state lines for purposes of reverse engineering and replicating (or nearly replicating) them.

74.     Individual Defendants even used Plaintiffs to *actually fund* their competitive business. For example, in late 2023, Stern paid Hazma Mukhta for graphic materials/photographs using *Plaintiffs'* own credit with Mukhtar. Likewise, another graphics designer in Brooklyn, New York (with whom Plaintiffs had an established relationship) was paid for graphic design services using Plaintiffs' credit. In that case, the designer had been told the services were for Plaintiff, but in reality, Individual Defendants misappropriated the work for their own product line.

75.     Upon information and belief, the Individual Defendants may have even used Plaintiffs' bank accounts to fund aspects of their competing business.

76.     The Individual Defendants also used Lifes Fortune original labels, photo shoots, and photographs for their own brand.

**F.  Embezzlement of Plaintiffs' Products and Resale on eBay**

77.     The Individual Defendants used other employees and subordinates employed by Plaintiffs to advance their illicit scheme. For example, they (i) asked these employees to collect and test product samples; (ii) enlisted Mike Dillon, another one of Plaintiffs' employees to sell Plaintiffs' products on his personal eBay account, and got him to transfer the proceeds from these sales to Roth, in cash; (iii) asked employees to provide sensitive formula relating to Plaintiffs' process for listing products and uploading data, which they then used to list their own competing products on online retailers such as Amazon.

78.     Defendants improperly and without any permission or authorization, removed Plaintiffs' products from Plaintiffs' warehouse. Defendants then advertised these products on eBay and sold them to third parties. The proceeds of sale were received in the Individual Defendants' controlled eBay account and then distributed to the Defendants.

79.     The sale of Plaintiffs' products on Mike Dillon's personal eBay account was done at the time that the Plaintiffs maintained and operated their eBay account. While the Individual Defendants were selling Plaintiffs products on their own eBay account through Mike Dillon, Plaintiffs' sales dropped significantly. Thus, not only were the Individual Defendants stealing Plaintiffs products, but they were also selling the very same products on eBay and competing with Plaintiffs all while still being employed by Plaintiffs and receiving a salary from the Plaintiffs.

**G.  Misappropriation of Plaintiffs' Confidential and Proprietary Information, Trade Dress and Trade Secrets**

80.     Despite their agreement and duty to maintain the confidentiality of Plaintiffs' proprietary information, Individual Defendants utilized that information for their own benefit and for the benefit of the Corporate Defendant.

81.     In particular, the Individual Defendants misappropriated Plaintiffs' confidential

information, business methods, know-how and other trade secrets and used the misappropriated information to develop and launch usurped business opportunities that clearly and indisputably belonged to Plaintiffs.

82.    In doing so, they disclosed information that was confidential and not publicly known, without Plaintiffs' knowledge or consent, and utilized that information for their own business purposes. This included, for example accessing, obtaining, downloading and stealing, for their own competitive purposes:

- customer lists, which had been gathered from prior product sales and registrations

- product design elements

- vendor, supplier, and specialty service provider lists and data

- proprietary business strategies;

- data on customers, product categories and e- commerce;

- marketing strategies and pricing information;

- product ingredient formula;

- information on costs, warranty programs;

- technical information relating to product methods and techniques; and

- Numerous keywords and excel sheets which Plaintiffs had spent millions of dollars collecting and composing;
- Plaintiffs QuickBooks files which were improperly shared with Defendants' investors.

83.    Plaintiffs derive an independent economic benefit from keeping this confidential information secret because a competitor attempting to use this information could try to replicate their successful commercialization strategies and other formula which took many years for them to develop.

84.    Individual Defendants intentionally sought to mimic specific packaging and design elements used by Plaintiffs on their competing products. This included ensuring that many of their

products featured common color schemes and utilizing the combinations of certain key product

words, phrases and descriptive language that had been incorporated within the design of Plaintiff's

successful product lines.

85.    For example, Defendants manufactured a cream with numerous duplicative

characteristics to a very similar cream sold by Plaintiffs:

<u>Plaintiffs' Joint and Muscle Cream</u>



<u>Defendants' Joint and Muscle Cream</u>



86.    Both products come in identical containers, have a label that includes the words

"JOINT & MUSCLE" plastered in large, all-white capitalized font, and use a nearly identical

dominant blue color theme. Both feature the words "fast acting," both feature an American flag and a "Made in the USA" icon, and both purport to be "Maximum Strength." Although Defendants took certain feigned steps to slightly differentiate their products (for example, using an *orange* versus *purple* secondary theme color, writing "**#1** *Arthritis pain relief*" instead of "**#1** *Doctor Recommended*," and writing "**3** *in 1*" rather than "**3** *x Faster,*" the look, feel and design of Defendants' products were clearly duplicative overall of those of Plaintiffs, and were deliberately designed to cause confusion on the part of customers.

87.   Similarly, the Individual Defendants used their campaign of corporate espionage, reverse engineering and outright theft to duplicate the branding style, look and feel of at least two of Plaintiffs' other products – Owell Naturals Draw Salve (which treats common skin conditions) and Owell Naturals Neuropathy cream (for Nerve Relief and recovery). In all three products, Individual Defendants sought to duplicate the product formulas as well, albeit with minor adjustments (such as adding some color to the formula, etc.) to mask their conduct.

88.   Upon information and belief, the Individual Defendants stole *hundreds* of product formulas from Plaintiffs, which they are likely to use unless stopped.

89.   Defendants also specifically sought to confuse consumers with their replicated product lines and caused them to believe they were actually purchasing products from Plaintiffs.

90.   In other cases, the Defendants falsely led Plaintiffs' consumers to believe that they were an additional source – outside of Plaintiffs' normal distribution channels – for the same products, albeit at better prices.

**H.**   **Defendants' Conceal their Unlawful Actions and Cover their Tracks**

91.   Individual Defendants employed a wide range of tactics to conceal their actions and prevent Plaintiffs from discovering the extent of their debauchery.

92.   This included, for example, directing communications from vendors (who believed

they were negotiating and communicating with Plaintiffs) to a separate WhatsApp chat platform they had opened outside of Plaintiffs internal email servers and communication platforms. In some cases, vendors were openly informed by Defendants – on Plaintiffs' email channels – that separate correspondence was sent via the WhatsApp platform and that the conversation should continue there.

93.     As noted above, the Individual Defendants also used false personas (such as "Ethan Collins") to communicate with outside parties in order to construe their true identities.

94.     The Individual Defendants also engaged in the wholesale deletion of hundreds or thousands of emails, documents, files and emails from Plaintiffs' email server. These also included emails sent by the Individual Defendants, while still employed by Plaintiffs and purportedly on behalf of Plaintiffs' behalf, clearly showing Individual Defendants used their association with Plaintiffs to obtain information for their own benefit and product lines. Many of these records were deleted months after the Individual Defendants had resigned.

95.     In anticipation of his looming departure from Plaintiffs' business, Roth also stole *Zahler's* work computer from the company office. He proceeded the same day to download certain confidential sales data and other proprietary information. His retention of the computer also served to prevent Plaintiffs from having the ability to discover the scheme.

96.     Obviously, the cover afforded to the Individual Defendants by Serenu's corporate veil allowed them to generate and retain the fruit of their unlawful scheme which had been completely built at Plaintiffs' expense.

**I.     False Sexual Abuse Allegations and Extortion Campaign**

97.     Defendants were not content to merely exploit Plaintiffs for the launch of their competing business.

98.     To intimidate Zahler from pursuing the Individual Defendants for their wrongdoing, Werzberger retained the services of an attorney named Allen Lowy who demanded

$10,000,000 from Zahler to compensate Werzberger and to keep him from going public and pursuing legal action for his claims of sexual harassment and rape allegedly committed by Zahler. These allegations were completely false and were manufactured from whole cloth as a devious tactic meant to harass, intimidate, bully and extort Zahler into submission and to prevent him from exposing the Individual Defendant's illicit corporate espionage scheme and competing business.

99.    Upon information and belief, this extortionate scheme was directed by and/or coordinated in conjunction with the other Individual Defendants.

100.    Knowing the allegations were false, Zahler refused to submit to Werzberger's or his attorney's obscene demands.

101.    Separate and apart from the aforesaid events, on December 5, 2023, a consumer of Serenu's products filed a breach of contract suit in the New York State Supreme Court, Kings County, captioned *Israel Meir Farkash v. Amazon Co. Inc. and Serenu, Inc., Index No 535409/2023.*

102.    The Individual Defendants' identities as the individuals behind Serenu were exposed within the context of this lawsuit. Fearing they would now be pursued by Plaintiffs who now had incontrovertible proof as to the individuals behind the anticompetitive business that was being used to destroy their commercia prospects, Werzberger decided to follow through with his earlier threats to destroy Zahler with the fabricated sexual abuse allegations. Upon information and belief, this plan was coordinated and directed in conjunction with the other Individual Defendants.

103.    Werzberger commenced two civil lawsuits falsely alleging sexual harassment and rape against Zahler in New York State Supreme Court, New York County (i) a case captioned *Shaya Werzberger v. Moses Zahler aka Moshe Zahler, Index No. 153074/2024 and* (ii) case captioned *Shaya Werzberger v. Moses Zahler aka Moshe Zahler, Index No. 154949/2024.* Werzberger's real, extortionate motivation behind his baseless sexual abuse suits against Zahler

was divulged to certain third parties who, in turn, communicated this to Plaintiffs prior to the filing

of this action.

## CLAIMS FOR RELIEF

### COUNT I
### FEDERAL TRADE DRESS INFRINGEMENT
### (against all Defendants)

104.    Lifes Fortune repeats and realleges paragraphs 1 through 103 as if fully set forth

herein.

105.    Life's Fortune's trade dress, including its product listings, is inherently distinctive

as to the source of the product.  In particular, Defendants copied the design, photography, and

details from Lifes Fortune listings to create listings to sell nearly identical, parallel products

through their own companies, including brands operated through Corporate Defendants.

106.    Defendants achieved this by misappropriating Life's Fortune's internal resources

to access and hire Life's Fortune's graphic designers and other vendors, which it at times

communicated with via false aliases to cover its tracks.

107.    Lifes Fortune's trade dress is not functional but is distinctive.

108.    Life's Fortune's trade dress has acquired secondary meaning through extensive

promotion and public recognition over many years.

109.    There is a strong likelihood of confusion between the source of the goods offered

by Defendants and those offered by Lifes Fortune.

110.    Defendants have willfully copied and employed the distinctive look, feel and

product design in their own product listings and are in violation of Section 43(a) of the Lanham

Act, 15 U.S.C. §1125(a).

111.    Defendants' unauthorized use of Plaintiffs' products' trade dress has caused, and

unless enjoined, will continue to cause, substantial and irreparable injury to Lifes Fortune for which Lifes Fortune has no adequate remedy at law, including substantial and irreparable injury to the goodwill and reputation associated with Life's Fortune's trade dress.

112.　Defendants' infringement of the Life's Fortune's trade dress was and is willful and reflects Defendants' intent to trade on the goodwill and brand recognition associated with the trademark.

113.　Lifes Fortune is entitled to injunctive relief, and also entitled to recover damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

**COUNT II**
**FEDERAL FALSE DESIGNATION OF ORIGIN AND UNFAIR**
**COMPETITION**
**(against all Defendants)**

114.　Lifes Fortune repeats and realleges paragraphs 1 through 113 as if fully set forth

herein.

115.　Defendants' offer to sell, and their sale, distribution and advertisement of products under the Life's Fortune trademarks and trade dress constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

116.　The trade dress of Plaintiffs' products is inherently distinctive as to the source of the product.

117.　Life's Fortune's trade dress is not functional but is distinctive.

118.　Life's Fortune's trade dress has acquired secondary meaning through extensive promotion, marketing, and public recognition over the course of Life's Fortune's operations.

119.　Defendants have willfully copied and employed the distinctive trade dress in their own competing business and are in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

120.    Defendants' unauthorized use of the Lifes Fortune trade dress constitutes unfair competition and the use of a false designation of origin that is likely to cause confusion and deceive customers as to the impression that Defendants' products are authorized by or associated with Lifes Fortune in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

121.    Defendants engaged in the unauthorized use and misappropriation of Plaintiffs' products' trade dress (including the design and the look and feel of Plaintiffs' products, and the combined marketing and branding terminology of the products). These activities were and continue to remain likely to cause confusion on the part of customers and were and continue to deceive customers as to the true affiliation, connection, association, and origin of the products.

122.    Defendants' false portrayal of their own competing products as those of Plaintiffs,

123.    Defendants' commercial activities, including their false portrayal of their own competing products as those of Plaintiffs, and their use of Plaintiffs' own resources including funds, computers, email addresses, and personnel, to conceal their true identity in order to falsely represent to vendors that they were acting on behalf of Plaintiffs, falsely designated the origin of these efforts and caused confusion on the part of the vendors.

124.    Defendants' unauthorized use of the Plaintiffs' products' trade dress has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Life's Fortune for which Life's Fortune has no adequate remedy at law, including substantial and irreparable injury to the goodwill and reputation associated with Lifes Fortune.

125.    Defendants' infringement of the Lifes Fortune trade dress and trademark was and is willful and reflects Defendants' intent to trade on the goodwill and brand reputation of Lifes Fortune.

126.    There is a likelihood of confusion between the sources of the products being offered by Lifes Fortune and those being offered by Defendants.

127.    By way of example, Lifes Fortune has already been contacted by consumers purchasing products from Defendants which those consumers believe to be Life's Fortune's brand of products and who are seeking to register those products with Lifes Fortune.

128.    Lifes Fortune has no adequate remedy at law.  If use of the Lifes Fortune trademark and trade dress by Defendants' is not enjoined, Lifes Fortune will suffer substantial and irreparable injury to its business reputation and the goodwill associated with Life's Fortune's trademark and trade dress.

129.    Lifes Fortune is entitled to injunctive relief, and also entitled to recover its damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

### COUNT III
### MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
#### (against all Defendants)

130.    Plaintiffs repeat and reallege paragraphs 1 through 129 as if fully set forth herein.

131.    The Individual Defendants were given access to Plaintiffs' Confidential information as a result of their employment.

132.    The confidential information, which included trade secrets, included, among other things, proprietary data relating to pricing, costs, listings, sales, and other systems and methods relating to online retail, technical product specifications and testing, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce data.

133.    The Individual Defendants also had access to confidential formulas relating to Plaintiffs' products and listing processes, business and market strategies, as well as to Plaintiff's online platforms email servers, and computers.

134.    Plaintiffs took reasonable steps to maintain the confidentiality of its confidential

information including by, among other things, requiring employees to enter into non-disclosure agreements prohibiting the unauthorized disclosure and use of Plaintiffs' confidential information, as well as implementing various cybersecurity and/or technological features to safeguard the information and protect it from being breached.

135. The Individual Defendants have egregiously misappropriated Plaintiffs' confidential information for their own benefit, and to Plaintiffs' detriment by using it to directly compete with Plaintiffs' products.

136. As a direct and proximate result of the Individual Defendants' misappropriation of Plaintiffs' confidential and proprietary information, Plaintiff is threatened with, and has already experienced: (a) the loss of product sales, (b) the loss of business expectancies, customers, vendor-relationships and goodwill; (c) substantial and irreparable harm. Plaintiffs will continue to be harmed unless the Individual Defendants are enjoined and restrained by order of the court.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND**
**TRADE SECRETS ACT, 18 U.S.C. § 1836**
**(against all Defendants)**

137. Lifes Fortune repeats and realleges paragraphs 1 through 136 as if fully set forth

herein.

138. By virtue of their employment with Lifes Fortune, the Individual Defendants were given access to and knowledge of Plaintiffs' trade secrets, such as, proprietary customer lists, data relating to pricing, costs, listings, sales, distribution, and other systems and methods relating to online retail, business and marketing strategy, technical product specifications and testing information, sales data, e-commerce data, and other commercially sensitive information such as vendor relationships, the identity of contractual counterparties, internal cost structures and operating expenses.

139.    The Individual Defendants used those trade secrets in breach of the terms of their employment and the confidential relationship with Plaintiffs.

140.    The Corporate Defendants used those trade secrets after obtaining them by improper means including their egregious efforts to operate what was effectively an in-house corporate espionage gambit at Plaintiffs' business to steal the secrets, both inside and outside of their working hours for Plaintiffs.

141.    Plaintiffs' confidential information, including its trade secrets, were developed and maintained by Plaintiffs over the course of years, through Plaintiffs' painstaking time and effort, at significant expense to Plaintiffs, and included information and secrets maintained on password-protected networks which were allowed to be accessed only by Plaintiffs' own employees having the need to use such trade secrets on Plaintiffs' behalf and for its benefit.

142.    In addition, Plaintiffs have taken reasonable measures to maintain the secrecy of its confidential information, including its trade secrets, including by requiring employees to sign agreements prohibiting disclosure, having policies in place restricting the use of this sensitive information, and with cybertechnology and/or technological features designed to prohibit unauthorized disclosure and breach.

143.    The Individual Defendants had no right to retain or use any of Plaintiffs' trade secrets (or any other confidential information) for their own benefit- let alone to compete against Plaintiffs.

144.    Plaintiffs' confidential information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of such information.

145.    The Individual Defendants knew that the information they used constituted trade

secrets belonging to Plaintiffs.

146.    The Individual Defendants provided this information for use by the Corporate Defendants as well.

147.    Defendants possess, retain, have used, and continue to use Plaintiffs' confidential information and trade secrets to compete with and/or otherwise harm Plaintiffs.

148.    Plaintiffs did not consent to the Individual Defendants' (or any of their Companies') use of its confidential information or trade secrets.

149.    Defendants have used Plaintiffs confidential information, including its trade secrets without express or implied consent from Plaintiffs.

150.    Defendants knew or should have known that Plaintiffs' confidential information, including its trade secrets, (1) are confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Plaintiffs at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Plaintiffs competitors; (5) would provide significant benefit to a competitor seeking to compete with Plaintiffs; and (6) are critical to Plaintiffs' ability to conduct its business successfully.

151.    Defendants misappropriated Plaintiffs' confidential information, including its trade secrets, without Plaintiffs' consent.

152.    Defendants will be or are unjustly enriched by their misappropriation of Plaintiffs' confidential information, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Plaintiffs' confidential information, including its trade secrets.

153.    Defendants' misappropriation has been willful and malicious.

154.    As a direct and proximate result of the Defendants' misappropriation of Plaintiffs'

confidential information, including its trade secrets, Plaintiffs have lost and will be threatened with the continued loss of business expectancies, customers, employees, its trade secrets and goodwill and otherwise be substantially and irreparably harmed unless the Individual Defendants are enjoined and restrained by order of the Court.

155.    Unless restrained by this Court, Defendants will cause further irreparable harm to Plaintiffs.

156.    Plaintiffs are also entitled to a seizure order providing for the seizure from the Defendants of Plaintiffs' confidential information, including its trade secrets, insofar as necessary to prevent the propagation, dissemination, and use of them.

157.    In addition, as a result of the Defendants' conduct, Plaintiffs have suffered direct and consequential damages, and are entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

158.    Plaintiffs are also entitled to injunctive relief.

**COUNT V**
**BREACH OF THE COMMON LAW DUTY OF LOYALTY UNDER NEW YORK LAW**
**(against the Individual Defendants)**

159.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if fully set forth herein.

160.    An employee is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

161.    The Individual Defendants breached the common law duty of loyalty they owed to Plaintiffs by taking the various actions alleged herein, which included, among other things, secretly forming and operating a corporate espionage gambit while they were under the employ of Plaintiffs, utilizing in bad faith their access to Plaintiffs' resources for their own competing venture, and severely breaching the trust placed in them by Plaintiffs to divert significant corporate

opportunities away from Plaintiffs to themselves.

162.   Plaintiffs have suffered damages by reason of the actions of the Individual Defendants in violating and participating in the violation of the duty of loyalty.

163.   Plaintiffs are entitled to an award of damages in an amount to be determined at trial.

## COUNT VI
## UNJUST ENRICHMENT
### (against all Defendants)

164.   Plaintiffs repeat and reallege paragraphs 1 through 163 as if fully set forth herein.

165.   Defendants have been enriched by using the materials, trade secrets, concepts, confidential and proprietary information, and resources in operating their competing businesses.

166.   Defendants misappropriated the materials, trade secrets, concepts, confidential and proprietary information, and resources without permission, justification and without paying for them.

167.   It is contrary to equity and good conscience to permit the Defendants to retain the materials, trade secrets, concepts, confidential and proprietary information, and resources of Plaintiffs without compensating Plaintiffs.

168.   Plaintiffs are entitled to an award of damages in an amount to be determined at trial, plus interest.

## COUNT VII
## BREACH OF FIDUCIARY DUTY UNDER NEW YORK LAW
### (against the Individual Defendants)

169.   Plaintiffs repeat and reallege paragraphs 1 through 168 as if fully set forth herein.

170.   The Individual Defendants were employees of Plaintiffs and in that capacity had a duty to act for and give advice for the benefit of Plaintiffs. Plaintiffs reposed trust and confidence in the Individual Defendants.

171.    The Individual Defendants owed a duty of good faith and loyalty to Plaintiffs.

172.    The Individual Defendants owed Plaintiffs a fiduciary duty both during and after their employment not to use Plaintiffs confidential information, trade secrets and other resources other than for purposes of their employment and for Plaintiffs' benefit.

173.    The Individual Defendants breached their fiduciary duties to Plaintiffs by making improper use of Plaintiffs' time, facilities, personnel, confidential information, proprietary secrets and resources to create a competing business.

174.    The Individual Defendants' use of Plaintiffs' proprietary information and trade secrets and their decision to conduct a devious corporate espionage operation constituted an egregious breach of trust and confidence.

175.    The Individual Defendants diverted and exploited various opportunities that belonged to Plaintiffs during the time of their employment with Plaintiffs and thereafter.

176.    The Individual Defendants usurped, without consent, opportunities belonging to Plaintiffs in which Plaintiffs had a tangible expectancy.

177.    The Individual Defendants' breaches of their fiduciary duties were the proximate cause of substantial damages to Plaintiffs.

178.    Based on the foregoing, Plaintiffs are entitled to an award of damages, both compensatory and punitive.

**COUNT VIII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY UNDER NEW YORK LAW**
**(against Corporate Defendants)**

179.    Plaintiffs repeat and reallege paragraphs 1 through 178 as if fully set forth herein.

180.    The Individual Defendants breached their fiduciary duties to Plaintiffs by making improper use of Plaintiffs time, facilities, confidential information, proprietary secrets and resources to create a business competing with Plaintiffs.

181.    The Corporate Defendants knowingly participated in and facilitated the breaches of the Individual Defendants' fiduciary duties, providing substantial assistance to the Individual Defendants.

182.    Plaintiffs suffered damages as a result of the Defendants' conduct.

183.    Based on the foregoing, Plaintiffs are entitled to an award of damages, both compensatory and punitive.

## COUNT IX
## UNFAIR COMPETITION UNDER NEW YORK LAW
### (against all Defendants)

184.    Plaintiffs repeat and reallege paragraphs 1 through 183 as if fully set forth herein.

185.    The Individual Defendants' unlawful activities as set forth herein constitute unfair and improper actions against Plaintiffs, resulting in monetary injury to Plaintiffs, as well as injury to Plaintiffs' reputation and good will.

186.    The Individual Defendants' bad faith actions took advantage of the labors and expenditures of Plaintiffs, and Defendants are using the fruits of those labor and expenditures to unfairly compete with Plaintiffs.

187.    In addition to converting Plaintiffs' funds and tortiously interfering with Plaintiffs' business relationships, the Individual Defendants — while they were trusted employees of Plaintiffs — used Plaintiffs' resources to fund and operate one or more companies outside the scope of their employment for Plaintiffs.

188.    The Individual Defendants unlawfully misappropriated and exploited Plaintiffs' resources, assets, connections, personnel, processes, and property rights to the Individual Defendants' own commercial advantage in order to further their infringing activity and to obtain an unfair competitive advantage over Plaintiffs.

189.    With knowledge of the reputation Plaintiffs' products have, Defendants intended to

and did trade on the goodwill and brand recognition associated with Plaintiffs' products by manufacturing, distributing, promoting and selling products using Plaintiffs' trade dress.

190.    The Individual Defendants' acts were and are likely to cause confusion, mistake and deception to consumers as to the affiliation, connection, or association of Defendants' products with Plaintiffs' brands and as to the origin and approval of Plaintiffs with regard to Defendants' products.

191.    The Individual Defendants used their position at Plaintiffs and their affiliation with Plaintiffs to promote themselves and their companies at the expense of Plaintiffs. This even included deliberate acts to sabotage Plaintiffs by causing delays in the distribution of Plaintiffs' products, while simultaneously accelerating the distribution of Defendants' own competing products in order to allow it to enter and gain a foothold in the market.

192.    Based on their activities, which involved others who are currently unknown to Plaintiffs, the Individual Defendants kept all of the profits resulting from their illicit activities for themselves and unidentified individuals who conspired with the Individual Defendants to divert resources and profits away from Plaintiffs.

193.    The Individual Defendants unlawful acts constitute unfair competition as proscribed by New York common law.

194.    The Individual Defendants' acts of unfair competition have caused Plaintiffs to sustain pecuniary damage, loss, and injury.

195.    The Individual Defendants engaged in these activities knowingly, willfully and in the utmost bad faith.

196.    The acts of unfair competition complained of herein, unless enjoined by this Court, will continue to cause Plaintiffs to sustain irreparable damage, loss, and injury.

197.    Plaintiffs have no adequate remedy at law.

198.   Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including punitive damages, as well as injunctive relief.

### COUNT X
### VIOLATION OF NY GEN BUS L § 360-L
### (against the Individual Defendants)

199.   Plaintiffs repeat and reallege paragraphs 1 through 198 as if fully set forth herein.

200.   The Individual Defendants have in bad faith misappropriated and used a commercial advantage belonging to Plaintiffs by exploiting proprietary information, trade secrets, and by engaging in unfair competition.

201.   The Individual Defendants have physically taken, copied, and/or used confidential information of Plaintiffs.

202.   The Individual Defendants have also diluted Plaintiffs' trade dress.

203.   The Individual Defendants have engaged in a sustained barrage of continuous anticompetitive tactics including but not limited to (i) improperly leveraging Plaintiffs' proprietary customer lists, vendor relationships, and business formulas; (2) operating a corporate espionage gambit to launch a competing business; (3) using Plaintiffs' bank credit and resources to fund their competing businesses; (4) misappropriation of Plaintiffs' formula relating to online product listings and e-commerce techniques; (5) deliberately sabotaging Plaintiffs' business to gain a foothold in the market; (6) gaining sensitive information and product samples under false pretenses by pretending to be acting on Plaintiff's behalf and/or via aliases to avoid detection; and (7) covering their tracks by deleting emails and files from Plaintiffs' systems both before and after their departure from Plaintiffs' employ.

204.   The aforementioned activities have caused and are likely to continue causing injury to Plaintiffs' business reputation and/or dilution of Plaintiffs' brand.

205.   Plaintiffs have no adequate remedy at law.

206.    Plaintiffs are entitled to a permanent injunction enjoining Defendants from using Plaintiffs trade dress and proprietary information.

## COUNT XI
## DIVERSION OF CORPORATE OPPORTUNITY UNDER NEW YORK LAW
### (against the Individual Defendants)

207.    Plaintiffs repeat and reallege paragraphs 1 through 206 as if fully set forth herein.

208.    As part of their employment with Plaintiffs, the Individual Defendants dealt directly with Plaintiffs' manufacturers and vendors to facilitate the manufacturing, production and supply of Plaintiffs' products for marketing and sale to hundreds of thousands of retail consumers in the United States.

209.    The Individual Defendants took actions to misdirect Plaintiffs' sales and marketing efforts and assets, without any authority and contrary to the interests of Plaintiffs, which had a negative impact on continues to interfere with Plaintiffs' business.

210.    This includes but is not limited to highly egregious conduct such as Individual Defendants' embezzlement of customer lists and product formulas for their own benefit, embezzling products from Plaintiffs' warehouse and selling them on separate and/or personal e-Bay accounts, as well as misleading and/or leveraging the trust and relationships with vendors and other commercial players that had been painstakingly cultivated by Plaintiffs, which all had the effect of siphoning sales and opportunities away from Plaintiffs.

211.    As another example, the Individual Defendants deliberately brought about delays in production for Plaintiffs' products while expediting production of their own competing products. In doing so, the Individual Defendants diverted hundreds of thousands of dollars in profits that would have gone to Plaintiffs into their own pocket or those of their corporations.

212.    The Individual Defendants usurped these and other corporate opportunities to their own competing business for own their financial benefit.

213.    Plaintiffs had a tangible expectancy in those corporate opportunities that were diverted by

the Individual Defendants

214.    The Individual Defendants' actions were made for a wrongful purpose and in bad faith, and they used dishonest, unfair and improper means to disrupt and interfere with Plaintiffs' established business relationships with its manufacturers, vendors and customers.

215.    Plaintiffs were damaged by the Individual Defendants' diversion of its corporate opportunities.

216.    Based on the foregoing, Plaintiffs are entitled to an award of damages to be determined at trial, including the return of compensation paid to the Individual Defendants, compensatory damages, profits the Individual Defendants achieved based on the diversion of Plaintiffs' corporate opportunities, and punitive damages.

## COUNT XII
## BREACH OF CONTRACT AGAINST STERN
### (against Stern)

217.    Plaintiffs repeat and reallege paragraphs 1 through 216 as if fully set forth herein.

218.    Defendant Stern entered into a written and binding agreement with Nektar, a predecessor of Life's Fortune (the "Stern Contract").

219.    The Stern Contract provided that Stern "not establish, open, be engaged in, finance, invest in, nor in any manner whatsoever become interested, directly or indirectly, as employee, owner, partner, agent…director, officer or otherwise, in any business, trade or occupation which competes with the business…..including…through any online, email or social networking media."

220.    The aforementioned non-complete expressly applied during the period of employment and for the five-year period thereafter.

221.    The Stern Contract also expressly prohibited Stern from disclosing "any information regarding Nektar….to any third party without prior written consent of Nektar..."

222.    The Stern Contract also provided that Stern "shall not use or permit to be used any such information in any fashion or manner detrimental to the interest of Nektar…."

223.    The Stern Contract was a valid and enforceable agreement.

224.    Defendant Stern breached his contractual obligations to each of Nektar, its principals (including Zahler), and its successor, Life's Fortune, by: (1) violating his non-compete obligations in his pursuit, development and heavy engagement in a business that directly competed with Plaintiffs during the period restricted by the agreement; (2) disclosing confidential information, including proprietary data, know-how, trade secrets and other sensitive and coveted information including but not limited to customer lists, Business/market strategies and of Plaintiffs to third parties wrongfully and without consent, in direct violation of his written contractual undertakings; (3) using the confidential information, including proprietary data and trade secrets of Plaintiffs, in a manner that was and remains highly detrimental to all Plaintiffs; (4) working for a competing business during working hours for which Stern was being paid to work for his employer; and (5) using his employer's resources to launch and support a competing business which was directly adverse to the interests of his employer.

225.    The aforementioned breaches of contract were even more egregious in light of the fact that they began while Stern was still employed and being paid by Plaintiffs.

226.    As a result of these breaches, Plaintiffs have been harmed and are entitled to recover damages.

**COUNT XIII**
**BREACH OF CONTRACT**
**(against Roth and Werzberger)**

227.    Plaintiffs repeats and realleges paragraphs 1 through 226 as if fully set forth herein.

228.   Defendants Roth and Werzberger each had a binding, contractual relationship with Plaintiffs including by virtue of their role as employees for one or more Plaintiffs for several years during which time they consistently were paid for their work.

229.   Each of Defendants Roth and Werzberger breached their respective contractual obligations with Plaintiffs including but not limited to by (1) disclosing their employer's confidential information, including proprietary data, know-how, trade secrets and other sensitive and coveted information including but not limited to customer lists, Business/market strategies and of Plaintiffs to third parties wrongfully and without consent; (2) working for a competing business during working hours for which they were being paid to work for their employer; and (3) using their employer's resources to launch and support a competing business which was directly adverse to the interests of their employer; and (4) using the confidential information, including proprietary data and trade secrets of Plaintiffs, in a manner that was and remains highly detrimental to all Plaintiffs.

230.   As a result of these breaches, Plaintiffs have been harmed and are entitled to recover damages.

**COUNT XIV**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**
**(against Individual Defendants)**

231.   Lifes Fortune repeats and realleges paragraphs 1 through 230 as if fully set forth herein.

232.   At all relevant times, Plaintiffs painstakingly cultivated and maintained valuable ongoing business relationships with manufacturers, vendors and other third parties, which permitted Plaintiffs to produce and/or purchase products at reasonable prices and to earn a profit when those goods were sold to Plaintiffs' retail customers.

233.   The Individual Defendants were aware of the aforesaid relationships.

234.   These business relationships were significantly harmed by the Individual

Defendants' actions.

235.   As part of their employment, the Individual Defendants were given direct access to and dealt with Plaintiffs' manufacturers, vendors and other third parties to facilitate the manufacturing, production, marketing, promotion, sale, and supply of Plaintiffs' products for marketing and sale to retail consumers in the United States.

236.   The Individual Defendants took numerous actions to misdirect Plaintiffs' marketing efforts and assets, contravening the directives of Plaintiffs and negatively impacting and interfering with Plaintiffs' business.

237.   In doing so, the Individual Defendants diverted significant profits that would have gone to Plaintiffs into their own pockets and/or those of their competing corporations.

238.   Some of the third parties wrongfully co-opted by the Individual acquiesced to their entreaties to work with their competing businesses. This harmed Plaintiffs' relationships with these parties and caused Plaintiffs significant financial harm.

239.   The Individual Defendants' actions were taken for a wrongful purpose and in bad faith, and they used dishonest, unfair and improper means to disrupt and interfere with Plaintiffs' established business relationships.

240.   The Individual Defendants had no justification for their actions.

241.   The Individual Defendants knew that but for the actions taken by the Individual Defendants in, among other things, contravening Plaintiffs' instructions, usurping Plaintiffs' business relationships with its manufacturers, vendors and other third parties, and interfering with Plaintiffs' product orders and ability to maximize sales, Plaintiffs would have continued to maintain and grow these beneficial business relationships.

242.   As a result of the Individual Defendants dishonest, unfair, and improper acts

of interference, Plaintiffs lost potential profits and endured damage to their business relationship with those entities.

243.    Upon information and belief, the harm caused to Plaintiffs business was the Individual Defendants' intended result.

244.    As a result of the Individual Defendants' actions, Plaintiffs have suffered pecuniary damages, including the loss of sales.

245.    As a proximate result of the Individual Defendants' wrongful acts, Plaintiffs have also been irreparably harmed and are entitled to injunctive relief and damages for an amount to be determined at trial.

## COUNT XV
## COMMON LAW FRAUD
### (against Individual Defendants)

246.    Lifes Fortune repeats and realleges paragraphs 1 through 245 as if fully set forth herein.

247.    In connection with the unlawful conduct of Defendants described herein, the Individual Defendants made overt and fraudulent statements to Plaintiffs, misrepresentations to other employees at Life's Fortune and Owell, and others with regard to, among other things, reimbursement of expenses claimed to be related to Plaintiffs' business, the purpose of their trips to visit vendors attend trade conferences and other corporate meetings and events, their competing business, the need for certain confidential business information including but not limited to customer lists and product formulas (which they really intended to use of for their own competing businesses), the use of Plaintiffs' trade dress, and trade secrets, and their decisions regarding the pricing and marketing of Plaintiffs' products.

248.    Plaintiffs relied on those representations to their detriment, providing

continued access to its information and systems, bank accounts, credit, personnel, and resources.

249.    Unbeknownst to Plaintiffs, the Individual Defendants' true purpose was to insidiously siphon as much information as possible on Plaintiffs' products, formulas and strategies in order to position themselves to be able to cut out Plaintiffs and ramp up their own competing business – at first from within the four walls of Plaintiffs' business (and on Plaintiffs' dime), and ultimately, having achieved enough know-how to operate on their own, from without.

250.    Essentially, the Individual Defendants used their lies and all the information obtained under false pretenses to post and boost their competing products while at the same time depressing the marketability of Plaintiffs' products.

251.    Plaintiffs are entitled to recover damages, both compensatory and punitive.

## COUNT XVI
## CONVERSION UNDER NEW YORK LAW
### (against all Defendants)

252.    Lifes Fortune repeats and realleges paragraphs 1 through 251 as if fully set forth herein.

253.    Plaintiffs solely owned the funds in its bank accounts, the credit they built with their vendors, and the accounts had with online selling platforms such as Amazon.

254.    The individual Defendants conspired to use, and did use, Plaintiffs' credit with vendors to support its own competing business. This included but is not limited to using Plaintiffs' credit with commercial graphic artist Hazma Mukhtar to pay for and procure commercial graphic materials for Defendants' own products.

255.    The Individual Defendants conspired to steal, and did steal, products from Plaintiffs' warehouse to sell via personal eBay accounts, for their own profit.

256.    Defendants conspired to access, and did access, sensitive and highly valuable customer lists and, upon information and belief, other proprietary information to support its own competing business.

257.    Defendants also conspired to take and/or delete, and did take and/or delete, electronic records, files and information from Plaintiffs' computers, which expressly belonged to Plaintiffs.

258.    Plaintiffs demanded the return of the aforementioned funds, products, misappropriated credit, lists, records, files and information, but Defendants have refused to comply with this demand causing Plaintiff significant damages.

259.    Defendants also conspired to utilize, and did utilize, with an important email password necessary to access an important Amazon platform known as "Vendor Central" which was necessary to enable direct sales to Amazon and was vital in securing Plaintiffs significant business opportunities. Plaintiffs repeatedly demanded the return of this email information and access, but Defendants failed to comply for the 9-month period following the conclusion of his employment with Plaintiffs.

260.    Defendants' actions and omissions have deprived Plaintiffs of these funds and opportunities.

261.    In unlawfully converting those funds, credit, lists, platform access, records, files, and information, Defendants, without permission or authority, have assumed and exercised the rights and ownership over the monies, assets, and business opportunities rightfully belonging to Plaintiffs and have converted same to their own use and purpose to the exclusion of Plaintiffs' ownership rights.

262.    Defendants' improper exercise of the rights of ownership over Plaintiffs' monies, assets, credit, lists, platform access, records, files, information and business opportunities are

inconsistent with Plaintiffs' ownership rights to the same and constitutes unlawful conversion of Plaintiffs' property.

263.    By reason of the foregoing, Plaintiffs have sustained damages and have suffered irreparable harm.

264.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial plus interest.  Plaintiffs are also entitled to punitive damages.

**COUNT XVII**
**CIVIL RICO CLAIM**
**(Violation of 18 U.S.C. § 1962(c))**
**(against all Defendants)**

265.    Plaintiffs repeat and reallege paragraphs 1 through 264 as if fully set forth herein.

266.    The Individual Defendants, acting in association with each other and other unnamed co-conspirators, with the Corporate Defendants under their control, formed an illegal association-in-fact and engaged in a pattern of racketeering activity, the principal objections of which were, among other things: (1) to deprive Plaintiffs of property and profits, with regard to corporate opportunities that were usurped by the enterprise; (2) to misappropriate and misuse Plaintiffs' trademark, trade dress, trade secrets and proprietary information to obtain a competitive advantage over Plaintiffs while at the same time sabotaging the market of Plaintiffs products (using the trust reposed in them); (3) to steal, embezzle and convert Plaintiffs monies, assets and property for their own benefit, and (4) to conceal their unlawful conduct from Plaintiffs and others.

267.    Defendants, with criminal intent and through a pattern of racketeering activity, operated the association-in-fact that constituted a criminal enterprise (the "Enterprise"), which functions from New York, and which affected interstate commerce.

268.    The Enterprise had an ascertainable structure and hierarchy that set it apart from the mere commission of predicate acts set forth herein, and that form a pattern of racketeering activity.

269.    At all relevant times, Defendants were "persons" within the definition of 18 U.S.C.

§ 1961(3) and 1962(c).

270.    The Individual Defendants operated and controlled an enterprise within the meaning of 18 U.S.C. § 1961(4).

271.    In the alternative, the association-in-fact of all the "persons' listed herein constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and for pleading purposes, this association-in-fact is also included in the definition of the Enterprise.

*The RICO Enterprise*

272.    Defendants and their co-conspirators were a group of persons associated together in fact for the common purpose of carrying out the Enterprise, which was an ongoing criminal enterprise, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the Enterprise.

273.    The Enterprise was an association-in-fact where its members, the Defendants herein and others, functioned as a continuing unit over a substantial period of time in a pattern of acts to achieve the objects of the Enterprise. Defendants' common purpose in using and operating the Enterprise were: (1) to collect from Plaintiffs unjustified payment and reimbursement of costs related to their competing business, but which they fraudulently represented resulted from actions taken for the business of Plaintiffs; (2) misappropriate Plaintiffs' trademark, trade dress, trade secrets, assets, customer lists, resources, credit, and other confidential and proprietary information to operate a competing business and pass off their products as Plaintiffs' products, relying on the goodwill and reputation associated with Plaintiff  brand; (3) usurp and divert Plaintiffs' corporate opportunities for Defendants' own financial benefit; (4) take advantage of the trust and confidence reposed in the Individual Defendants in their employment by Plaintiffs to depress and negatively impact the commercialization of Plaintiffs' products while simultaneously enabling the launch, accelerating the distribution and boosting the sales of their own competitive products in market;

and (5) improperly conceal the full extent of the true facts from Plaintiffs as well as to use strong-armed, extortionate and/or illegal tactics to prevent enforcement by Plaintiffs of their rights.

274.   The primary managers who operated the Enterprise were the Individual Defendants, who operated for both their own benefit, as well as for the benefit of the Corporate Defendants.

275.   From the beginning, Defendants' activities were designed to prevent detection and prosecution.  The Defendants and their unnamed co-conspirators fraudulently concealed and continue to fraudulently conceal the full extent of the true facts from Plaintiffs, including by using false aliases, using false pretenses to obtain sensitive information, withholding from Plaintiffs an email password necessary to access to a coveted status it had obtained on a critical sales platform, deleting and/or stealing Plaintiffs' emails, documents and files to prevent discovery of the full extent of their unlawful conduct, and using the threat of false sexual abuse claims to keep Plaintiffs from seeking to enforce its rights and recover damages resulting from the Individual Defendants' illicit corporate espionage scheme and their competitive business. Defendants have obstructed and continue to obstruct Plaintiffs' ability to determine the full extent of the conduct of the Enterprise.

276.   At all relevant times, the Enterprise was engaged in, and its activities affected foreign and interstate commerce within the meaning of 18 U.S.C. § 1962(c).

277.   The Individual Defendants have, for the duration of the Enterprise, been responsible for overseeing the scheme, and directing others to take actions necessary to accomplish the Enterprise's overall purposes. Other than the Individual Defendants, the specific membership, roles and organization of Enterprise has been generally structured to operate as a unit to accomplish the overall wrongful purposes of the scheme.

*The Pattern of Racketeering Activity*

278.   From at least 2020, continuing through the present, Defendants engaged in a pattern of racketeering activity.

279.    Specifically, Defendants engaged over a number of years in a continuous scheme or artifice to embezzle and defraud Plaintiffs' out of money, credit, property and assets, and have used the trust and confidence reposed in Individual Defendants to divert Plaintiffs' corporate opportunities and business expectancy for their own benefit.  Defendants' scheme constituted multiple and repeated violations of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341 & 1343) and theft of trade secrets (18 U.S.C. § 1832).

280.    Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiffs' and/or others (including Plaintiffs, employees, vendors and e-commerce platforms).

281.    In furtherance of their scheme, and as described herein, Defendants engaged in mail fraud by placing and causing to be placed matters and things in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service, and deposited or caused to be deposited matters and things to be sent or delivered by any private or commercial interstate carrier, and/or engaged in wire fraud by transmitting, or causing to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, faxes and emails including those described herein.

282.    Defendants also engaged in theft of trade secrets, as described herein, with the intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of the members of the Enterprise stole, and/or without authorization appropriated, concealed, and/or by fraud, artifice, or deception obtains such information, knowing that their actions would injure Lifes Fortune. Defendants also conspired with the members of the Enterprise to commit the theft of the trade secrets.

283.    Defendants also engaged in multiple acts of embezzlement including but not limited to by using their position as employees of Plaintiffs to steal, for their own benefit, and to Plaintiffs'

detriment (a) customer lists and other proprietary and competitive information belonging to Plaintiffs; (b) personnel employed by and resources owned by Plaintiffs during working hours and while being paid by Plaintiffs; (c) Plaintiffs' credit to pay for services needed for their competing venture, including for example, Plaintiffs' credit with commercial graphic artist Hazma Mukhtar; and; (d) proceeds from sales of Plaintiffs' products.

284.    Defendants intended that Plaintiffs, its vendors, consumers, and e-commerce platforms such as Amazon would rely upon the fraudulent misrepresentations and deceitful conduct in which the conspirators engaged, and Plaintiffs were in fact deceived and defrauded by the racketeering conduct of Defendants.

285.    In addition, from at least 2022 and continuing to the present, Defendants, in furtherance of the objects of the Enterprise, planned to, took steps to, have actively concealed their wrongful deeds – including but not limited to by withholding passwords and deleting hundreds, if not thousands, of emails and files belonging to Plaintiffs - and continue to obstruct Plaintiffs' investigation of the same.

286.    In addition, to protect the Enterprise, Werzberger and the Individual Defendants coordinated to extort Zahler by manufacturing fabricated sexual harassment claims and obscene financial demands in an attempt to strongarm Zahler and keep Plaintiffs from exposing their illicit and anticompetitive business scheme.

287.    Each of the criminal acts described herein were in furtherance of the conspiracy of persons conduct the Enterprise.

288.    Defendants agreed to "conduct or participated in the conduct" of the Enterprise's affairs through a "pattern of racketeering activity" which the Individual Defendants knew would include a scheme to defraud Plaintiffs and misappropriate its trade secrets, carried out by at least two criminal acts within a period of less than four years.

289.    The allegations herein constituted unlawful, related, and continued predicate acts by Defendants. The conduct of each of Defendants described herein constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). This pattern of racketeering activity continues to date.

290.    Plaintiffs were directly and proximately injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Plaintiffs directly and proximately caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, wrongfully diverted and fraudulent procured funds, credit, assets, documents, emails, property, and corporate opportunities, misappropriated trade secrets and proprietary information including customer lists and product formulas, and attorneys' fees and costs associated with uncovering and exposing the Defendants' fraudulent scheme, in an amount to be proved at trial. Plaintiffs are entitled to treble damages.

291.    Plaintiffs' injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violations of 18 U.S.C. § 1962(c), because Plaintiffs were the target and victim of Defendants' unlawful Enterprise. Defendants actively concealed these injuries from Plaintiffs for many months, if not years.

292.    Each of Plaintiffs is an "innocent person" in this matter. None of Plaintiffs in way benefited from the operation of the Enterprise, and all of them were the Enterprise's intended victim.

293.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, trebled, plus interest. Plaintiffs are also entitled to punitive damages.

**COUNT XVIII**
**CONSPIRACY TO VIOLATE RICO**
**(Violation of 18 U.S.C. § 1962(d))**
**(against all Defendants)**

294.    Lifes Fortune repeats and realleges paragraphs 1 through 293 as if fully set forth

herein.

295.   Defendants unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others both named and unnamed in this Complaint to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

296.   Defendants knew that they were engaged in a conspiracy to commit the predicate acts alleged herein, and they knew that the predicate acts were part of such racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

297.   Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to, among other things, convert and deprive Plaintiffs' assets and monies, usurp corporate opportunities, and use Plaintiffs' trademark, trade dress, trade secrets and proprietary information to obtain a competitive advantage over Plaintiffs and to bolster its competing business and depress that of Plaintiffs, steal, embezzle and convert Plaintiffs monies, assets and property for their own benefit, and conceal all unlawful conduct from Plaintiffs and others.

298.   It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the predicate acts of racketeering set forth herein, as well as the active concealment thereafter.

299.   As a direct, proximate and intended result of the Defendants' RICO conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of Plaintiffs have been injured in their business and deprived of their property. Defendants' activity concealed both the full nature of their conspiracy as well as the extent of the resulting injuries to Plaintiffs arising therefrom.

## COUNT XIX
## ACCOUNTING
### (against all Defendants)

300.    Plaintiffs repeats and realleges paragraphs 1 through 299 as if fully set forth herein.

301.    At all times relevant hereto, a fiduciary relationship existed between Individual Defendants and Plaintiffs.

302.    The amount of money due from Defendants to Plaintiffs is unknown and cannot be ascertained without an accounting from the Defendants of the revenues and profits realized by the Defendants.

303.    Equity demands that Defendants be required to fully and intelligently account for all revenues and profits realized from the unlawful acts complained of herein.

## COUNT XX
## COMPUTER FRAUD AND ABUSE ACT CLAIM
### (Violation of 18 U.S.C. § 1030)
### (Against the Individual Defendants)

304.    Plaintiffs repeat and reallege paragraphs 1 through 303, as if fully set forth herein.

305.    The Individual Defendants accessed and used Plaintiffs' computer, email and IT systems without permission and after they were instructed and directed not to access any of Plaintiffs' private, secret, valuable, and confidential electronic records, and after the relationship between Individual Defendants and Plaintiffs had already terminated. This included, but was not limited to (a) using Plaintiff's emails and computer systems to obtain Plaintiffs' sensitive customer information in an anti-competitive manner; (b) deletion of numerous emails and files from Plaintiffs' computer and email system ("Deletions"), including months after the termination of their employment by Plaintiffs; and (c) withholding and refusing to return Plaintiffs' computer and Company email password which enabled access to a critical Amazon platform and which was vital in securing Plaintiffs significant business opportunities (collectively, the "Unlawful Computer Access").

306.    The Individual Defendants perpetrated the Unlawful Computer Access, multiple times, for the purposes of obtaining valuable information from Plaintiffs, to both use against

Plaintiffs as leverage, as well as to unlawfully use for their/Serenu's own benefit to misdirect business from Plaintiffs' customers to Serenu.

307.    The computer, email and IT system accessed by Individual Defendants was at all relevant times protected, via password and/or other encryption controls, and were to be accessed only by authorized users.

308.    Individual Defendants were not authorized to use in said manner Plaintiffs' computer, email and IT systems at or during any of the times they committed the multiple actions constituting the Unlawful Computer Access.

309.    To the extent Individual Defendants ever had any authorization to ever enter any of the areas on or within Plaintiffs' computer, email and IT systems, all such permissions and credentials had been clearly, unequivocally and categorically revoked, by the time they departed from their employment by Plaintiffs.

310.    Individual Defendants obviously committed the Unlawful Computer Access, including the Deletions, intentionally and with malice and forethought, with a clear intent to steal from, extort, defraud and injure Plaintiffs, resulting in the intended objective by Individual Defendants.

311.    As a proximate and direct result of Individual Defendants' Unlawful Computer Access, Plaintiffs have lost significant and valuable resources and have been damaged by at least $250,000, in both lost revenues and consequential damages as well as costs incurred, including but not limited to the expenditures of resources in restoring some of the infrastructure, data, programs and other information damaged or lost as a result on Individual Defendants' Unlawful Computer Access.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment against Defendants as follows:

a)  A permanent injunction;

b)  A seizure order providing for the seizure from Defendants of Plaintiffs' trade secrets, confidential information, deleted files and documents, customer lists, product formulas, and other proprietary information insofar as necessary to prevent Defendants' further propagation or dissemination of Plaintiffs' trade secrets;

c)  An award of damages in an amount to be determined at trial, including without limitation direct, consequential, actual, incidental, compensatory as well as the reasonable attorneys' fees and expenses Plaintiffs have been forced to incur to identify, investigate, address and remediate Defendants' wrongdoing;

d)  An award of treble damages;

e)  An award of punitive damages;

f)  Interests;

g)  Injunctive Relief; and

h)  Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs Lifes Fortune demands trial by jury for all issues so triable.

Dated: Brooklyn, New York
        July 3, 2024

                              Respectfully submitted,
                              BRUCK LLP

                              By: _/s/ Yair Bruck_
                                    Yair Bruck
                                    YB@BruckLLP.com

                                    1207 East 34th Street
                                    Brooklyn, New York 11210
                                    (212) 593-9090 (phone)
                                    *Attorneys for Plaintiffs Lifes Fortune, LLC*