UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LIFE'S FORTUNE LLC, *et al.*,

                                 Plaintiffs,

         - against -

SERENU INC., *et al.*,

                                 Defendants.

-------------------------------------------------------------x

**OPINION & ORDER ON
MOTION TO DISMISS**

No. 24-CV-5066 (CS)

Appearances:

Yair Bruck
Bruck LLP
Brooklyn, New York

Felicia J. Boyd
Nathaniel W. Mannebach
Norton Rose Fulbright US LLP
Minneapolis, Minnesota

Michael A. Samalin
Norton Rose Fulbright US LLP
New York, New York
*Counsel for Plaintiffs*

Jeffrey Zachter
Zachter PLLC
New York, New York
*Counsel for Defendants Serenu Inc. and Joseph Stern*

Noam Besdin
Adam Stein
Stein Adler Dabah & Zelkowitz LLP
New York, New York
*Counsel for Defendant Shmuel Mayer Roth*

Seibel, J.

      Defendants Serenu Inc. and Joseph Stern, and Defendant Shmuel Mayer Roth, have

moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6). (ECF Nos. 38-39.) For the reasons set forth below, the motion is granted with prejudice as to certain claims and without prejudice as to others.[1]

## I.    BACKGROUND

For purposes of the motion, I accept as true the facts, but not the conclusions, set forth in Plaintiffs' Amended Complaint. (ECF No. 36 ("AC").)

### A.    Facts

Moshe Zahler, a New York resident who owns two New York businesses, Life's Fortune LLC and Owell Naturals Brand LLC, brings this action along with those entities (collectively, "Plaintiffs") against former employees Joseph Stern, Shaya Werzberger and Shmuel Mayer Roth, all New York residents, and their business, Serenu Inc. ("Serenu"), a Delaware corporation with its principal place of business in New York (collectively, "Defendants"). (*Id.* ¶¶ 1, 6-12.) Plaintiffs allege that Stern, Werzberger and Roth, while employed by Plaintiffs and thereafter, infringed on Plaintiffs' trade dress; stole trade secrets, other proprietary information, and equipment and products from Plaintiffs' health supplements and cosmetics companies; diverted opportunities, pitches and products from Plaintiffs' vendors; and withheld and deleted electronic data from Plaintiffs' laptops – all to help kick-start their new business Serenu. (*Id.* ¶¶ 1-4, 146.) Plaintiffs seek damages and a permanent injunction against Defendants for a variety of federal and state law claims. (*See id.* ¶ 5.)

#### 1.    Plaintiffs' Businesses, Trade Dress and Trade Secrets

Plaintiffs sell a wide range of health and wellness products, primarily through e-commerce sites like Amazon and eBay, as well as retail stores. (*See id.* ¶¶ 17-19.) Plaintiffs'

---

[1] Defendant Roth also filed a letter motion requesting oral argument. (ECF No. 46.) That motion is denied.

product lines include vitamins, supplements, cosmetics and over-the-counter ("OTC") products, and Plaintiffs allege that their businesses have primarily grown through their industry experience and relationships; trade dress, trade secrets and other propriety information; and "Vendor Central" status on Amazon. (*Id.* ¶¶ 17-20.)

Plaintiffs allege that they have developed a distinct and protected trade dress for Owell Naturals' product line and describe the protected features of the trade dress as:

> an identically shaped and sized container and lid; a white lid; contrasting color for the lid compared to the color of the container; a lid featuring a large, bolded statement of a characteristic of the product; a prominent placement of the brand at the top of the container; a generic name for the product in the middle of the container in a different color than the container and in a larger font than anything else; and uses for the product at the bottom of the container[.]

(*Id.* ¶ 42.)

Plaintiffs allege that Owell Naturals' trade dress is not functional because competitors in the OTC product space have adopted different packaging. (*See id.* ¶ 43-44.) Plaintiffs further state that the Owell Naturals' trade dress "is recognized by consumers as signifying a single source for the products," as evinced by their exclusive use of the trade dress since 2022, advertising expenditures of more than $1,800,000, sales of approximately 1,000,000 products and favorable product reviews on Amazon. (*Id.* ¶ 46.)

Plaintiffs also allege they have developed and own a wide range of trade secrets, "including, but not limited to, product formulas; customer lists; vendor, supplier, and specialty service provider lists; and business, marketing, and pricing strategies developed through data that Plaintiffs[] have gathered on customers, product categories, and e-commerce throughout their existences." (*Id.* ¶ 76.) Plaintiffs allegedly developed these trade secrets "over the course of

3

years, through Plaintiffs' painstaking time and effort, at significant expense to Plaintiffs," and took steps to maintain the secrecy of these trade secrets. (*Id.* ¶¶ 77, 79.)[2]

### 2.    Stern's, Roth's and Werzberger's Employment

In 2016, Plaintiff Life's Fortune's predecessor entity, Nektar, hired Stern as a purchasing employee. (*Id.* ¶ 21.) Stern and Plaintiffs[3] entered into an employment contract whereby Stern would be paid an annual salary and bonuses; agreed not to start, work for or invest in a competitor business for five years following his employment; and was prohibited from disclosing company information to third parties or using such information to the company's detriment. (*Id.* ¶¶ 21-22.) Over time, Stern became a manager, earned a salary increase, and received training on Plaintiffs' business strategies and product formulas. (*Id.* ¶¶ 23-24.) In his role, Stern had "unfettered access to Plaintiffs' valuable and confidential information, trade secrets . . ., and business know-how." (*Id.* ¶ 24.) Stern's employment with Plaintiffs lasted until June 2023. (*Id.* ¶ 26.)

Plaintiffs hired Roth and Werzberger in 2020 as Chief Financial Officer and Operations Manager, respectively, and entered into contracts with them on the same terms as Stern. (*Id.* ¶¶ 27-28, 34-35.) Like Stern, Roth and Werzberger were paid salaries; earned raises during their employment; received specialized training; and had access to Plaintiffs' alleged trade secrets, business strategies and other confidential information. (*Id.* ¶¶ 29-30, 36-37.) Roth worked

---

[2] These measures include requiring non-disclosure agreements for employees, implementing cybersecurity and technological features to prevent data breaches, password-protecting online networks, contracting with vendors and manufacturers to maintain confidentiality, and using physical locks at their offices. (AC ¶ 79.)

[3] The AC does not specify which entities or natural persons, aside from Stern, were parties to the contract, beyond stating that the other parties were "Plaintiffs." (*See* AC ¶ 22.) The same is true for Plaintiffs' allegations regarding Roth's and Werzberger's employment contracts. (See *id.* ¶¶ 28, 35.)

closely with third parties, such as Plaintiffs' vendors and manufacturers, and had substantial responsibility concerning the purchasing, marketing and sale of Plaintiffs' products.  (*Id.* ¶ 32.) Werzberger was the company administrator for corporate emails and accounts with e-commerce websites and health food stores.  (*Id.* ¶ 40.)  Werzberger resigned in December 2022, and Roth left about a year later in December 2023.  (*Id.* ¶¶ 33, 41.)

### 3.    The Alleged Scheme to Benefit Serenu

At some point in 2022, before Stern, Roth and Werzberger left Plaintiffs' employ, the trio decided to start up their own business venture, which eventually became Serenu, and divert, steal, destroy or otherwise misappropriate Plaintiffs' trade dress, trade secrets, business relationships, electronic information and products for their own gain.  (*Id.* ¶¶ 88-91.)

As to Stern, the AC largely alleges misconduct that occurred after he left his job in 2023. (*See id.* ¶¶ 92-105.)  For months, Stern retained a company laptop and phone, and the password for the email account that Plaintiffs used to access "Vendor Central" on Amazon.  (*Id.* ¶¶ 92-93, 98-99.)  "Vendor Central" is how businesses like Plaintiffs' can sell directly to Amazon, and the platform gives additional benefits, such as access to bulk ordering from Amazon, content tools, and a "Sold by Amazon" designation to boost credibility with customers.  (*Id.* ¶ 93.)  Without access, Plaintiffs lost business.  (*Id.* ¶ 94.)  Plaintiffs asked Stern for the password, but Stern refused for months, and when he did finally return it nearly nine months after his employment ended, "hundreds, if not thousands" of confidential business records stored in the email account had been deleted.  (*Id.* ¶¶ 92, 95-96.)  Stern had also deleted all data on Plaintiffs' laptop when he returned the device and has refused to return Plaintiffs' phone.  (*Id.* ¶¶ 98-99.)  Stern "worked to substantially duplicate or mimic Plaintiffs' product formulas" for more than 100 products, and he relied on the same production facilities, marketing experts and vendors that Plaintiffs used.

(*Id.* ¶ 97.)  In 2023, Stern used Plaintiffs' credit to pay for work from one of Plaintiffs' graphic designers that was not for Plaintiffs, and Stern also used one of Owell Naturals' email addresses to contact one of Plaintiffs' manufacturing vendors, Pure Source, to develop products for Serenu. (*Id.* ¶¶ 100, 103-04.)[4]

As to Roth, before he left his job with Plaintiffs, he began downloading confidential sales data and other proprietary information from a stolen computer.  (*Id.* ¶ 106.)  Roth also purchased products and services for Serenu from Pure Source and one of Plaintiffs' graphic designers, both of whom only did business with Roth because Roth said he was working on Plaintiffs' behalf. (*Id.* ¶¶ 107-08.)  Roth also entered "unauthorized keywords" on Plaintiffs' Amazon platform, leading the e-commerce giant to temporarily shut down one of Plaintiffs' listings.  (*Id.* ¶ 112.) Keywords help drive customers to product listings on Amazon, but inputting inappropriate, misleading or "legally problematic" terms can cause Amazon to suspend or ban a user from the platform.  (*Id.* ¶¶ 109-11.)  The suspension caused Plaintiffs to lose $500,000 in sales and required the services of an Amazon consultant to restore the product listing.  (*Id.* ¶¶ 113-14.) Roth used this lull in Plaintiffs' listing to boost one of Serenu's "look-alike" products that competed with Plaintiffs'.  (*Id.* ¶ 115.)  Additionally, Roth directed another one of Plaintiffs' employees, who is not a party to this lawsuit, to submit fraudulent Medicaid time sheets to enrich Roth.  (*Id.* ¶¶ 116-18.)  The same employee also listed for sale on his eBay account products that Werzberger had stolen from Plaintiffs' warehouse, and gave the proceeds to Roth.  (*Id.* ¶¶ 120- 23.)  Roth also sent Werzberger Plaintiffs' customer list, which included names and contact

---

[4] The AC also alleges that one of Stern, Roth or Werzberger used Plaintiffs' credit to pay for graphic design work for Serenu with another designer, who would not have done so knowing that the work was for a competitor of Plaintiffs.  (AC ¶¶ 101-02.)

information for more than 3,000 customers, and Roth allegedly continues to pay Plaintiffs' employees for trade secrets and confidential information.  (*Id.* ¶¶ 119, 124.)

As to Werzberger, he stole thousands of dollars' worth of products from Plaintiffs' warehouse and gave them to the non-party employee who listed them on his personal eBay account.  (*Id.* ¶¶ 125-26.)  Like Stern, Werzberger kept a laptop from Plaintiffs after he left his job, and returned the laptop with its data deleted.  (*Id.* ¶ 127.)  He also maintains access to one of Plaintiffs' email accounts containing alleged trade secrets and confidential information that he refuses to return.  (*Id.* ¶ 128.)  Werzberger also fabricated sexual harassment and rape allegations against Zahler, demanded $10,000,000 in exchange for not "going public," and eventually commenced two civil lawsuits against Zahler in New York State Supreme Court, New York County.  (*Id.* ¶¶ 129-33.)

Plaintiffs further allege that one of Stern, Roth or Werzberger engaged in additional acts of misconduct, but Plaintiffs are not aware who specifically among the three engaged in each of the actions, which include:  (i) using a fictitious name to contact one of Plaintiffs' graphic design vendors and engage him in design work on behalf of Serenu that was to be kept secret; (ii) contacting other suppliers and vendors of Plaintiffs, including via Plaintiffs' email addresses, to source products for Serenu and directing their communications onto private WhatsApp chats; (iii) using their time while employed at Plaintiffs' businesses to develop Serenu's business; (iv) diverting to Serenu product samples and sales pitches from Plaintiffs' vendors and service providers and, while working for Plaintiffs, contacting third parties met at conferences and other trade shows to advance Serenu's business; (v) ordering products for Serenu from Plaintiffs' vendors that led to delays to Plaintiffs' orders; (vi) reverse engineering Plaintiffs' product formulas from product samples; (vii) directing Plaintiffs' employees to collect product samples

and formulas for Defendants; (viii) using Plaintiffs' bank accounts to fund Serenu; and (ix) deleting from Plaintiffs' email servers documents showing Defendants using their positions with Plaintiffs to benefit Serenu.  (*Id.* ¶¶ 135-53.)

Serenu, meanwhile, began selling competitive products with similar names and uses under the Pure Ease brand name.  (*Id.* ¶¶ 53-55.)  The packaging in which these products are sold is alleged to "adopt the vast majority, if not the entirety, of the distinctive features of Owell Naturals' Trade Dress."  (*Id.* ¶ 57; *see id.* ¶ 42.)  In fact, Plaintiffs use identical language to describe Owell Naturals' trade dress and the Pure Ease products' trade dress.  (*Id.*)  The products have such significant similarities because Defendants used the same labels, photographs and graphic designers that Owell Naturals employed.  (*Id.* ¶ 59.)  Plaintiffs did not consent to Serenu's use of the trade dress.  (*Id.* ¶ 63.)  Serenu's products are sold and promoted through many of the same channels of trade as Plaintiffs'.  (*Id.* ¶¶ 61-62.)  As a result, some consumers have sought to register with Plaintiffs products that they purchased from Serenu.  (*Id.* ¶ 69.)

### B.       **Procedural History**

Plaintiffs initiated this action on July 3, 2024.  (ECF No. 1.)  Defendant Werzberger answered the complaint on August 6, 2024, (ECF No. 14), but the remaining Defendants filed pre-motion letters on October 28, 2024 in anticipation of motions to dismiss, (ECF Nos. 26-27). The Court held a pre-motion conference on December 6, 2024, at which the Court (1) granted Plaintiffs leave to amend and (2) set a briefing schedule.  (*See* Minute Entry dated Dec. 6, 2024.) Plaintiffs filed the Amended Complaint on January 15, 2025.  (*See* AC.)  Defendant Werzberger answered, (ECF No. 37), but the remaining Defendants filed the instant motions, (ECF Nos. 38-39).

The AC sets forth claims for: (1) trade dress infringement under the Lanham Act; (2) trademark infringement (based on trade dress) under New York law; (3) misappropriation of confidential information under New York law; (4) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"); (5) breach of the duty of loyalty under New York law; (6) unjust enrichment; (7) breach of fiduciary duty under New York law; (8) aiding and abetting breach of fiduciary duty under New York law; (9) unfair competition under New York law; (10) trade dress dilution under New York law; (11) diversion of corporate opportunity under New York law; (12)-(14) breaches of contract under New York law; (15) tortious interference with business expectancy under New York law; (16) conversion under New York law; (17) accounting under New York law; and (18) violation of the Computer Fraud and Abuse Act ("CFAA").  Defendants move to dismiss all counts, except Count 14, which is a breach of contract claim only against Werzberger.

## II.    <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[5]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

---

[5] Unless otherwise indicated, all case quotations omit internal citations, quotation marks, alterations and footnotes.

will not do." *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   **DISCUSSION**

Defendants Stern and Serenu jointly filed a motion with an accompanying memorandum of law, (ECF No. 38 ("Stern Mem.")), while Defendant Roth filed his own motion, (ECF No. 39), and accompanying memorandum, (ECF No. 41 ("Roth Mem.")).  In their memoranda, they adopt and incorporate by reference each other's arguments to the extent applicable.  (Stern Mem. at 1 n.1; Roth Mem. at 2 n.1.)[6]

---

[6] Although some "courts in this Circuit [have] declin[ed] to consider arguments incorporated by reference because such a practice violates the Local Rule on page limitations," *Cook v. EaglePicher Techs., LLC*, No. 22-CV-1893, 2024 WL 360814, at *3 (S.D.N.Y. Jan. 31, 2024), Plaintiffs have not objected on that ground, (*see* ECF Nos. 42 ("Opp. to Stern Mem.") & 43 ("Opp. to Roth Mem.").)

Plaintiffs plausibly allege a variety of wrongful acts on Defendants' parts, but I focus on the three federal statutory claims because, in the absence of diversity of citizenship among the parties, those claims provide the basis for the Court's jurisdiction. *See* 28 U.S.C. § 1331. As discussed below, I find that the federal claims are not plausibly alleged, and I decline to exercise supplemental jurisdiction over the state law claims.

### A.      Lanham Act Claim

The moving Defendants seek to dismiss Plaintiffs' federal trade dress infringement claim (Count I) brought under the Lanham Act. Section 43(a) of that statute "prohibits a person from using 'any word, term, name, symbol, or device, or any combination thereof' that is 'likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (quoting 15 U.S.C. § 1125(a)).

"To establish a claim of trade dress infringement under § 43(a), plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (emphases in original) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). Even if distinctive, trade dress must also be nonfunctional to be afforded protection. *Id.*; *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 537 (S.D.N.Y. 2011). A plaintiff must also "demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's." *Fun-Damental*, 111 F.3d at 999 (citing *Two Pesos*, 505 U.S. at 769-70). And "[t]o plead a claim of trade dress infringement involving the overall appearance of a product, a plaintiff must offer . . . 'a precise expression of the character and scope of the claimed trade dress.'" *Eliya, Inc. v. Steven Madden, Ltd.*, 749 F. App'x 43, 46 (2d Cir. 2018) (summary order) (quoting *Landscape Forms, Inc. v.*

*Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)); *see Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 121-25 (2d Cir. 2025) (describing the "articulation requirement" as a separate inquiry from whether plaintiff has plausibly alleged distinctiveness, non-functionality and likelihood of confusion); *NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*, No. 20-CV-8389, 2022 WL 2110551, at *2 (S.D.N.Y. June 10, 2022) (plaintiff must first "identify the specific elements of its trade dress" and then show "that (1) the trade dress is distinctive as to the source of the good, (2) there is a likelihood of confusion between its good and defendant's, and (3) the trade dress is not functional.").

Trade dress generally falls into the categories of product packaging or product design, and the "standard for assessing the distinctiveness of a product's trade dress depends on the category of trade dress for which protection is sought." *Pure Power Boot Camp*, 813 F. Supp. 2d at 537. Plaintiffs contend that they are seeking protection for the former. (Opp. to Roth Mem. at 8.) Defendants do not seem to dispute that packaging is in issue, (*see* ECF No. 45 ("Roth Reply") at 1 n.2; Opp. to Roth Mem. at 8-9), and I agree that Plaintiffs' claims concern product packaging.

To determine whether product packaging is inherently distinctive, the Second Circuit utilizes the *Abercrombie* test, "which classifies trade dress on a spectrum of increasing distinctiveness, as either: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *Pure Power Boot Camp*, 813 F. Supp. 2d at 538 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)); *accord Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 189 (S.D.N.Y. 2022); *see Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 377-79 (2d Cir. 1997); *see also* 1 J. Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition § 8:13.50, Westlaw (database updated Mar. 2026) ("[C]ourts in the Second

Circuit have continued to use the *Abercrombie* test [for packaging and container designs]."). [7]

"The varieties of labels and packaging available to wholesalers and manufacturers are

virtually unlimited," and packaging trade dress is typically found to be arbitrary or fanciful as a

result. *Fun-Damental*, 111 F.3d at 1000. But "despite the broad opportunity to design an

arbitrary or fanciful trade dress, a specific trade dress must still be evaluated to determine

whether it is so distinctive as to point to a single source of origin and thereby be entitled to

Lanham Act protection." *Id.* Arbitrary or fanciful trade dress "'do[es] not communicate any

information about the product either directly or by suggestion.'" *See Easy Spirit, LLC v.

Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 71 (S.D.N.Y. 2021) (quoting *Star Indus., Inc. v.

Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005)). On the other end of the spectrum, generic

packaging generally includes packaging that is industry standard – "[f]or example, the cosmetics

industry's common use of black, rectangular-shaped compacts" or the soda industry's use of

green bottles for lemon-lime flavors. *Fun-Damental*, 111 F.3d at 1000; *see Lane Cap. Mgmt.,

Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) (describing generic trade dress

---

[7] The alternative, the *Seabrook* test, requires that packaging trade dress meet four elements to qualify as inherently distinctive:

(1) the design or shape should not be a common, basic shape or design.
(2) it should be unique or unusual in a particular field.
(3) it should not be a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods or services which consumers would view as mere ornamentation.
(4) it should create a separate commercial impression apart from any accompanying words.

1 McCarthy, *supra*, § 8:13.50. Although almost all courts have adopted this test for packaging trade dress, the Court declines to do so because courts in this Circuit have not done so. *See id.* But the Court notes that under this test, the lack of distinctiveness of Plaintiffs' packaging is even more pronounced.

as "a common description of products [that] refers to the genus of which the particular product is a species")  In the middle are descriptive trade dress, which "'tells something about a product, its qualities, ingredients or characteristics,'" and suggestive trade dress, which "'merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods.'"  *Easy Spirit*, 515 F. Supp. 3d at 71 (first quoting *Gruner + Jahr USA Publ'g. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993); and then quoting *Lane Cap. Mgmt.*, 192 F.3d at 344)).

Under the *Abercrombie* framework, suggestive and arbitrary/fanciful trade dress are considered inherently distinctive regardless of whether the trade dress has acquired secondary meaning, and thus always satisfy the first prong of the test for protected trade dress.  *See Fun-Damental*, 111 F.3d at 1000; *Landscape Forms*, 113 F.3d at 377.  Descriptive trade dress is considered inherently distinctive and protectable if it has acquired secondary meaning, while generic trade dress is never protectable.  *Kind LLC v. Clif Bar & Co.*, No. 14-CV-770, 2014 WL 2619817, at *2 (S.D.N.Y. June 12, 2014).

"Under the rubric of inherent distinctiveness, the focus of the inquiry is whether or not the trade dress of a product serves primarily as an indication of origin, such that consumers will readily rely on it to distinguish the product from those of competing manufacturers." *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 407-08 (2d Cir. 1997).  Trade dress protects the "overall look" of a product, and even where no one element of the trade dress is inherently distinctive, the combination of elements can indicate its source and warrant protection. *Landscape Forms*, 113 F.3d at 381.  Trade dress for an entire product line can be afforded protection if the overall look of each individual product is consistent.  *Yurman Design*, 262 F.3d at 116.  Two further considerations should factor into a court's consideration of distinctiveness:

14

(1) that "'overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas'"; and (2) "'just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance.'"  *Kind*, 2014 WL 2619817, at *2 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)).

> As previously discussed, Plaintiffs describes Owell Naturals' trade dress as:

> an identically shaped and sized container and lid; a white lid; contrasting color for the lid compared to the color of the container; a lid featuring a large, bolded statement of a characteristic of the product; a prominent placement of the brand at the top of the container; a generic name for the product in the middle of the container in a different color than the container and in a larger font than anything else; and uses for the product at the bottom of the container[.]

(AC ¶ 42.)

I will assume that Plaintiffs' description of their trade dress is sufficiently specific to satisfy the articulation requirement, *but see Cardinal Motors*, 128 F.4th at 124-25 ("[T]he description offered must be sufficiently precise as to some specific combination of components present in the trade dress (such as materials, contours, sizes, designs, patterns, and colors) . . . ."), but that does not mean Plaintiffs have plausibly alleged trade dress infringement, *see id.* at 125 ("[A] plaintiff may satisfy the articulation requirement even if the components described arguably render the trade dress overbroad, generic, not distinctive, or functional.").  But fatal to Plaintiffs' claim is that their "description[] amount[s] to a laundry list of the elements that constitute [the packaging's] features, with no explanation as to *how they are distinctive*."  *Eliya, Inc.*, 749 F. App'x at 47 (emphasis added); *see Yurman*, 262 F.3d at 117 ("[T]he party seeking protection must … be able to point to the elements and features that distinguish its trade dress."); *Shevy Custom Wigs, Inc. v. Aggie Wigs*, No. 06-CV-1657, 2006 WL 3335008, at *5 (E.D.N.Y. Nov. 17, 2006) ("The issue is not just *which* features are distinctive, but also *how* they are

15

distinctive.") (emphases in original).  A plaintiff may not simply "list[] *all* of the features of its [product] – many of which are not in the least distinctive – and allege[] that *all* of them, in 'combination,' constitute its trade dress."  *Deckers Outdoor Corp. v. It's Friday, Inc.*, No. 20-CV-10602, 2024 WL 5481211, at *5 (S.D.N.Y. Oct. 31, 2024) (emphases in original), *report and recommendation adopted*, 2025 WL 886882 (S.D.N.Y. Mar. 21, 2025).

Further, the chart of cases that Plaintiffs provide as examples of comparable descriptions of trade dress that have been afforded protection instead cut against their argument, because those examples include distinctive elements, whereas Plaintiffs' description of their alleged trade dress lacks distinctiveness.  (*See* Opp. to Roth Mem. at 10-12.)  *See, e.g.*, *Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, No. 22-CV-7719, 2024 WL 4555822, at *5 (S.D.N.Y. Oct. 23, 2024) ("the overhanging lid that does not sit flush with the base, the specific shape of the jar, the yellow and white color scheme, and the presence of SDJ's trademark on the product's oversized lid in a particular color and style"); *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 444 (S.D.N.Y. 2017) ("(1) an opaque black bottle; (2) a black cap; (3) a CK mark displayed in standard Calvin Klein logo lettering in simple typeface on the center portion of both the bottle and the packaging; and (4) the SHOCK name displayed in uppercase letter in neon green graffiti typeface below the CK mark on both the bottle and packaging"); *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent.*, LLC, 7 F. Supp. 3d 385, 402 (S.D.N.Y. 2014) ("a silhouette of one or more deciduous or barren trees against a contrasting or solid background vertically lining the side of receptacles and/or packaging therefore with some of the trees' branches extending to the opposite side of or encircling the receptacles or packaging therefor").  Unlike Owell Naturals, these parties seeking protection specify a combination of shapes, colors, unique fonts, or images and marks on their packaging that are suggestive or arbitrary/fanciful and allow consumers to

16

distinguish their goods.  Plaintiffs' description of Owell Naturals' trade dress largely includes "[c]ommon basic shapes or letters [that] are, as a matter of law, not inherently distinctive." *Star Indus.*, 412 F.3d at 382.  Its description essentially boils down to a jar with a white cap and the expected words describing the product.

Moreover, even assuming that Plaintiffs have plausibly alleged that Owell Naturals' products have a "look," they have not plausibly alleged that that "look" indicates that the product is from Owell Naturals.  *See Forschner Grp., Inc.*, 124 F.3d at 407-08 ("Under the rubric of inherent distinctiveness, the focus of the inquiry is whether or not the trade dress of a product serves primarily as an indication of origin, such that consumers will readily rely on it to distinguish the product from those of competing manufacturers."); *see also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001) ("A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers."); *Steven Madden, Ltd. v. Yves Saint Laurent*, No. 18-CV-7592, 2019 WL 2023766, at *5 (S.D.N.Y. May 8, 2019) (plaintiff must allege facts rendering it plausible that trade dress is "distinctive in terms of identifying the source of the product"); *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, 25 F. Supp. 2d 154, 162 (S.D.N.Y. 1998) ("Despite this mandate to focus on the overall appearance of the product, a plaintiff must still articulate the specific elements of the trade dress that render the trade dress unique or novel, that is, capable of being an identifier of the product's source."); *Fiji Water Co., LLC v. Fiji Min. Water USA, LLC*, 741 F. Supp. 2d 1165, 1176 (C.D. Cal. 2010) (packaging is inherently distinctive "if its intrinsic nature serves to identify a particular source").[8]

---

[8] To show lack of distinctiveness, Defendant Roth provides screenshots from Amazon of other brands of similar products with many of the same features, and in some cases a similar

17

Thus, Plaintiffs have not plausibly alleged that their trade dress is arbitrary or fanciful. Nor does their description show that the trade dress is "suggestive" under the *Abercrombie* test, because these common features and placement of words do not require consumers to "'use imagination, thought, and perception to reach a conclusion as to the nature of the goods.'" *See Easy Spirit*, 515 F. Supp. 3d at 71 (quoting *Lane Cap. Mgmt.*, 192 F.3d at 344).

Plaintiffs' inclusion of photographs does not save their claim. Although photos of Defendants' Pure Ease line show similarities with Owell Naturals' products, Plaintiffs still fail to explain how Owell Naturals' trade dress, standing alone, indicates that the product is Owell Naturals' or is otherwise inherently distinctive. *See APP Grp. (Can.) Inc. v. Rudsak USA Inc.*, No. 22-1965, 2024 WL 89120, at *2 (2d Cir. Jan. 9, 2024) (summary order) ("[I]nclusion of photographs does not salvage the insufficient description because pictures are not a substitute for a precise description."); *Eliya*, 749 F. App'x at 47 ("[P]hotos of the [products] do not make up for the deficiency in the precise expression of the distinctive features of the trade dress."); *Caraway Home, Inc. v. Pattern Brands, Inc.*, No. 20-CV-10469, 2021 WL 1226156, at *6 (S.D.N.Y. Apr. 1, 2021) (inclusion of images of products insufficient to sustain trade dress claims in light of plaintiff's general description of products); *Diamond Collection, LLC v. Underwraps Costume Corp.*, No. 17-CV-61, 2019 WL 347503, at *7 (E.D.N.Y. Jan. 22, 2019)

---

"overall look," as Plaintiffs' products. (ECF No. 40-3.) The parties dispute whether I can take judicial notice of these images. Although I suspect I can, *see, e.g.*, *Peacock v. 21st Amend. Brewery Cafe, LLC*, No. 17-CV-1918, 2018 WL 452153, at *2 (N.D. Cal. Jan. 17, 2018); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014), I need not, and do not, do so in order to resolve this motion. Likewise, Plaintiffs include photos of competitors' products to show that Owell Naturals' trade dress is not functional, given that some competitors use "significantly different trade dress" for similar products. (*See* AC ¶ 43.) In light of my disposition, I need not address functionality. I also need not reach the question of whether the AC has sufficiently alleged a likelihood of consumer confusion.

18

("Merely describing its products and providing pictures of them does not distinguish a particular trade dress.").

At best, the AC alleges that Owell Naturals has a descriptive trade dress, which must plausibly have acquired secondary meaning to warrant protection. "Trade dress is considered to have attained a secondary meaning when a consumer immediately associates the dress of the product with its source." *Urb. Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12-CV-3599, 2013 WL 866867, *3 (S.D.N.Y. Mar. 8, 2013). "Factors that are relevant in determining secondary meaning include '(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the dress's use.'" *Kind*, 2014 WL 2619817, at *4 (quoting *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 263 (2d Cir. 1996)).

Weighing these factors as alleged in the AC, Plaintiffs have not plausibly alleged that Owell Naturals' trade dress has attained secondary meaning in the marketplace. As to advertising expenditure, Plaintiffs have alleged that Owell Naturals "has spent over $1,800,000 advertising its products." (AC ¶ 46(c).) Some courts within this district have found even more generalized allegations of advertising expenditures to be sufficient at the motion to dismiss stage. *See Subversive Tools, Inc. v. Bootstrap Farmer LLC*, No. 23-CV-6946, 2025 WL 3229122, at *6 (S.D.N.Y. Nov. 19, 2025) (collecting cases finding the "advertising expenditure" factor to weigh in plaintiffs' favor even when no dollar figure provided). Other courts, however, have found allegations that include the sum of advertising expenditures to be insufficient where "there is no contention that any of those advertisements or promotions stressed or emphasized the alleged trade dress." *Urb. Grp. Exercise Consultants*, 2013 WL 866867, at *3. Given that Plaintiffs

19

allege a specific amount spent on advertising but fail to include any detail as to how the advertising featured Owell Naturals' trade dress, this allegation weighs neither in favor of nor against Plaintiffs. The AC makes no allegation concerning consumer studies, so factor two does not weigh in Plaintiffs' favor. The AC makes no allegation concerning unsolicited media coverage of the product, so factor three similarly does not weigh in Plaintiffs' favor. As to sales success, Plaintiffs allege that Owell Naturals has sold "approximately 1,000,000 products" and generally receives favorable reviews on Amazon. (AC ¶ 46(d)-(e).) Courts have found that raw sales numbers that "likely reflect[] millions-of-dollars in sales revenue" are sufficient to demonstrate sales success. *See Easy Spirit*, 515 F. Supp. 3d at 64 (collecting cases). Drawing inferences in favor of Plaintiffs at the motion to dismiss stage, factor four therefore weighs in Plaintiffs' favor. As to attempts to plagiarize the dress, the only allegation of copying that Plaintiffs levy is against Defendants, which, without more, weighs against a finding of secondary meaning. *See Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 600 (E.D.N.Y. 2017). And to the extent that Plaintiffs allege Defendants copied their trade dress, the AC does not allege facts beyond conclusory allegations that Defendants' copying was "'for the purpose of deceiving consumers as to the source of the product.'" *EBIN N.Y., Inc. v. SIC Enter., Inc.*, No. 19-CV-1017, 2023 WL 6141275, at *11 (E.D.N.Y. Sept. 20, 2023) (quoting *Fun–Damental*, 111 F.3d at 1005); *see id.* ("[T]he law does not preclude imitative intent in Lanham Act actions."). Factor five thus weighs against Plaintiffs. Finally, factor six – the length and exclusivity of the dress' use – also weighs against finding secondary meaning. The AC states that Plaintiffs have used their trade dress since 2022, (AC ¶ 46(a)), but courts in the Second Circuit hold that five years is generally the requisite period under this factor for continuous and exclusive usage of trade dress. *See Bubble Genius*, 239 F Supp. 3d at 600; *Shandong Shinho Food Indus. Co. v. May Flower*

20

*Int'l, Inc.*, 521 F. Supp. 3d 222, 259 (E.D.N.Y. 2021).  Although Plaintiffs cite authority that a product can acquire secondary meaning rapidly and in under five years, *see Eliya, Inc. v. Kohl's Dep't Stores*, No. 06-CV-195, 2006 WL 2645196, at *4 (S.D.N.Y. Sept. 13, 2006) (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1130 (Fed. Cir. 1993)), if it "becomes popular in a short period of time," *id.*, the AC does not allege facts from which one could plausibly infer that such was the case with Owell Naturals' products.  Factor six therefore weighs against finding secondary meaning.

In sum, with only one of the six factors weighing in Plaintiffs, they have not plausibly alleged that Owell Naturals' trade dress has acquired distinctiveness through secondary meaning in the marketplace.  Because they have alleged a descriptive trade dress that is not plausibly inherently distinctive, it is not plausibly afforded protection.  Accordingly, Defendants' motion to dismiss Plaintiffs' Lanham Act claim (Count I) is GRANTED.

## B.    **DTSA Claim**

The moving Defendants also seek to dismiss Plaintiffs' federal misappropriation of trade secrets claim brought under the DTSA, 18 U.S.C. § 1836 (Count IV).

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that [i] it possessed a trade secret, and [ii] the defendant misappropriated the trade secret."  *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022); *see Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).  Under the DTSA, "'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information," so long as the owner takes "reasonable measures to keep such information secret" and "the information derives independent economic value" from it being secret from others who can obtain their own economic value from

21

the information's disclosure or use.  18 U.S.C. § 1839(3).  Courts in this district have relied upon

six factors from the Restatement of Torts that serve as "guideposts, not elements" to determine

whether information qualifies as a trade secret under the DTSA.  *Iacovacci, LLC*, 437 F. Supp.

3d at 380; *see Catalyst Advisors*, 602 F. Supp. 3d. at 672; *24 Seven, LLC v. Martinez*, No. 19-

CV-7320, 2021 WL 276654, at *4 (S.D.N.Y. Jan. 26, 2021).  The factors are:

> (1) the extent to which the information is known outside of [Plaintiffs'] business;
> (2) the extent to which it is known by employees and others involved in his
> business; (3) the extent of measures taken by him to guard the secrecy of the
> information; (4) the value of the information to him and to his competitors; (5) the
> amount of effort or money expended by him in developing the information; (6)
> the ease or difficulty with which the information could be properly acquired or
> duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.

1990).  "It is not necessary to plead every single factor to state a claim, and the most important

consideration is whether the information is actually a secret."  *LivePerson, Inc. v. 24/7 Customer,

Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015).

Under the DTSA "a claimant bears the burden of identifying a purported trade secret with

sufficient specificity."  *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68

F.4th 792, 800 (2d Cir. 2023).  A plaintiff need not reveal its trade secrets in a complaint to

plausibly state a claim, but "that does not mean a party can get away with nebulous descriptions

at the highest level of generality."  *Catalyst Advisors*, 602 F. Supp. 3d at 672.  "A complaint that

only claims general categories of information and data as trade secrets does not state a claim

under the DTSA because it does not adequately put the defendant on sufficient notice of the

contours of the claim for misappropriation."  *TRB Acquisitions LLC v. Yedid*, No. 20-CV-552,

2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021); *see Syntel Sterling*, 68 F.4th at 801 ("The

specificity requirement places a defendant on notice of the bases for the claim being made

against it . . . ."); *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-cv-5540, 2018 WL 557906, at *6

(S.D.N.Y. Jan. 23, 2018) ("Alleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue, does not give rise to a plausible allegation of a trade secret's existence.").

Assuming there is a sufficiently alleged trade secret, misappropriation can occur via the acquisition, disclosure or use of that trade secret in specific circumstances involving "improper means." 18 U.S.C. § 1839(5); *see Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, No. 23-CV-9000, 2024 WL 3835264, at *6 (S.D.N.Y. Aug. 14, 2024) ("The DTSA contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use.") "Improper means" under the DTSA "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6). The Second Circuit has held that employees have a duty to former employers not to use trade secrets acquired during their employment in competition with the employer after they have been terminated. *Rocket Pharms.*, 2024 WL 3835264, at *6 (citing *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 47 (2d Cir. 1999)). A violation of this duty would plausibly allege the misappropriation element under the DTSA. *Id.*

The AC groups the alleged trade secrets in the following three general buckets: (1) formulas for Plaintiffs' health and wellness products; (2) lists or identities of customers, vendors, suppliers and other service providers; and (3) commercial strategies, data and methods related to Plaintiffs' pricing, marketing, and e-commerce listings and sales. (AC ¶ 182.) Plaintiffs have not plausibly alleged that any are trade secrets that were misappropriated.

23

### 1.    Product Formulas

As to the product formulas, although Plaintiffs have alleged that Defendants replicated or attempted to replicate their formulas for use at Serenu, (AC ¶¶ 97, 150), Plaintiffs have alleged only conclusory assertions that their formulas were secret or proprietary, (*see e.g.*, AC ¶¶ 76, 182).  The AC is devoid of anything, beyond conclusory boilerplate allegations that Plaintiffs apply to all of their alleged trade secrets, as to the value to Plaintiffs of the confidentiality of the formulas, the efforts they undertook to develop them or the measures they enacted to protect them.  (*See* AC ¶¶ 76-79, 187-88.)  *See GMH Cap. Partners v. Fitts*, No. 24-CV-290, 2025 WL 950674, at *8 (S.D.N.Y. Mar. 28, 2025) ("[T]he conclusory allegation that information is valuable to competitors and that [plaintiff] sought to keep that information secret does not confer trade secret status.").  Tellingly, the AC suggests that Plaintiffs relied on outside vendors for manufacturing their products, including vendors that would send products and samples to Plaintiffs, (*See* AC ¶¶ 32, 103-05, 146), but does not explain whether or how the formulas for the products that Plaintiffs ultimately sold were proprietary to Plaintiffs, rather than these vendors.  Plaintiffs' allegations differ from examples that they cite in support, which identified which specific documents constituted the alleged trade secrets, *see ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019), how the confidentiality of the specific information in question was valuable to the company, *see Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-CV-5966, 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017), and/or how the company developed the alleged trade secret, *see Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 424 (S.D.N.Y. 2021); *Medidata Sols., Inc., v. Veeva Sys. Inc.*, No. 17-CV-589, 2018 WL 6173349, *4 (S.D.N.Y. Nov. 26, 2018).

Of course, Plaintiffs did not need to reveal their product formulas or describe their formulas with more detail than plaintiffs in the above cited cases described their trade secrets, but their failure to allege facts beyond the AC's conclusory allegations renders the claim implausible. (*See* AC ¶¶ 76-79, 187.) Plaintiffs specify three products the formulas of which Defendant Stern is alleged to have tried to duplicate, (*id.* ¶ 97), but that does not save Plaintiffs' cause of action, *see Core SWX, LLC v. Vitec Grp. US Holdings, Inc.*, No. 21-CV1697, 2022 WL 3588081, at *7 (E.D.N.Y. July 14, 2022) ("Tying the general categories of information to the two [products] does not put [defendants] on notice as to the nature of the purported trade secret – it merely ties two general categories to two products as opposed to a specific algorithm, specific portion of the product, or specific document."), *report and recommendation adopted*, 2022 WL 3586570 (E.D.N.Y. Aug. 22, 2022).

### 2. Customer, Vendor, Supplier and Other Service Providers Lists

As to the customer, vendor, suppliers and other service provider lists, Plaintiffs similarly do not plausibly state a DTSA claim. The only specific allegation of a misappropriation of any of these categories of trade secrets is that Defendant Roth allegedly "sent Plaintiffs' customer list, containing the names and contact information for more than 3000 customers" to Defendant Werzberger's personal email. (AC ¶ 124.) Thus, even assuming Plaintiffs' vendor, supplier or other service provider lists could be trade secrets, Plaintiffs have not plausibly alleged misappropriation.

Plaintiffs are correct that customer or client lists can be a protected trade secret. (Opp. to Roth Mem. at 20.) *See Haber*, 188 F.3d at 46-47; *ExpertConnect*, 2019 WL 3004161, at *5. To plausibly allege as much, however, the AC must demonstrate how the "customers are not readily ascertainable and [their] patronage has been secured only through the expenditure of

25

considerable time and money." *Haber*, 188 F.3d at 47. "Where it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply." *24 Seven*, 2021 WL 276654, at *7 (quoting *Haber*, 188 F.3d at 46).

The AC does not provide sufficient detail as to Plaintiffs' customer lists for the Court to conclude that they have plausibly stated a claim.[9] The only specific allegation as to what the customer list contains is that it included "names and contact information." (AC ¶ 124.) Plaintiffs provide no facts – beyond the conclusory, boilerplate recital of the element that they apply to all their alleged trade secrets, *see Twombly*, 550 U.S. at 555 ("a formulaic recitation of the elements of a cause of action will not do") – as to how they developed this list; what use, if any, they made of it; or how the customers' identities would not be ascertainable. (AC ¶ 77.) And they do not allege that the list revealed anything about customer preferences. For all the Court can tell, the "customer list" could be just a spreadsheet downloaded from Amazon and did not require any effort on Plaintiffs' part to compile, was not used by Plaintiffs, and had no independent economic value. This paltry effort does not suffice to plausibly allege a trade secret.

### 3.    Other Alleged Trade Secrets

Plaintiffs also allege misappropriation of Plaintiffs' protected commercial strategies, data and methods related to pricing and e-commerce listings and practices. "Plaintiffs fail to plead *which* of the numerous categories of documents they describe in their Complaint are trade secrets – as opposed to mere confidential or proprietary information." *Sapir v. Rosen*, No. 20-CV-6191, 2021 WL 4482277, at *6 (S.D.N.Y. Sept. 30, 2021) (emphasis in original). Further, Plaintiffs allege only two specific instances of misappropriation within this category:  that Roth

---

[9] The same is true for the vendor/supplier/provider lists. The AC contains no facts about how they were compiled, why their contents might be unavailable to others in the field or what information they contain beyond what Defendants would know anyway from their experience.

"download[ed] some of Plaintiffs' confidential sales data and other proprietary information" for Serenu once he knew he would be leaving Plaintiff's employment, (AC ¶ 106), and that "[o]ne (or more) of Stern, Werzberger, or Roth asked Plaintiffs' employees . . . to provide a sensitive formula relating to Plaintiffs' process for listing products and uploading data (unbeknownst to these employees, this formula was used to list Serenu's products on online retailers such as Amazon)," (AC ¶ 152).  These descriptions of Plaintiffs' trade secrets are "so vague and indefinite as not to be entitled to protection under the law of trade secrets," *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (summary order); *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590 (2d Cir. 1963), because they do not "give Defendants adequate notice as to what the misappropriation allegations concern," *Medidata Sols*, 2018 WL 6173349, at *3.  Similar to their claims that their product formulas and customer lists were trade secrets, Plaintiffs allege no facts as to the value of these listing and data processes to them, their proprietary nature, or their efforts to develop them.  Plaintiffs make only conclusory allegations that they undertook substantial efforts to develop all their trade secrets and had security measures in place for them all.  (*See* AC ¶¶ 76-79.)[10]

Accordingly, Defendants' motion to dismiss Plaintiffs' misappropriation of trade secrets claim pursuant to the DTSA (Count IV) is GRANTED.

---

[10] Although pricing data and business strategies can constitute trade secrets under certain circumstances, "this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566-67 (S.D.N.Y. 2016); *see Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 97 (S.D.N.Y. 2022).  Basic data concerning a company's "underlying mechanics, such as the prices of materials and costs of manufacturing, are not trade secrets." *Free Country*, 235 F. Supp. 3d at 567.  As to the allegation specific to Roth, Plaintiffs have failed to allege that he took anything more than unprotected raw sales data. (*See* AC ¶ 106.)  As to Plaintiffs' "sensitive" formula relating to a listing and uploading process, this conclusory allegation provides no information from which the Court could plausibly infer that the data is the type of propriety information that warrants trade secret protection.

**C.      Computer Fraud and Abuse Act Claim**

Next, the moving Defendants seek dismissal of Plaintiffs' CFAA claim (Count XVIII), arguing that Plaintiffs insufficiently allege damages and loss from Defendants' actions.

"The CFAA penalizes one who 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer.'" *Broidy v. Glob. Risk Advisors LLC*, No. 19-CV-11861, 2023 WL 6258135, at *9 (S.D.N.Y. Sept. 26, 2023) (quoting 18 U.S.C. § 1030(a)(2)).  As relevant to this dispute, the CFAA provides a private cause of action to a person who "suffers damage or loss" due to a violation of the statute if the loss to the person during any one-year period is at least $5,000 in value.  *Verschleiser v. Frydman*, No. 22-CV-7909, 2023 WL 5835031, *15 (S.D.N.Y. Sept. 7, 2023); *see* 18 U.S.C. § 1030(c)(4)(A)(i)(I), (g).[11]  "Loss" under the CFAA "relates to costs caused by harm to computer data, programs, systems, or information services," and "damage" means "any impairment to the integrity or availability of data, a program, a system, or information."  *Van Buren v. United States*, 593 U.S. 374, 391 (2021) (citing 18 U.S.C. § 1030(e)(8), (11)).  "The statutory definitions of 'damage' and 'loss' thus focus on technological harms – such as the corruption of files – of the type unauthorized users cause to computer systems and data."  *Id.* at 391-92.  Put another way, although physical damage to the computer is not necessary, damages and losses under the statute are "inextricably intertwined with a harm to the computer system itself, its data, or delivery of service."  *Verschleiser*, 2023 WL 5835031, *15; *see Broidy*, 2023 WL 6258135, at

---

[11] A "person" includes a firm, corporation or legal or other entity.  18 U.S.C. § 1030(e)(12).

\*9; *see also Van Buren*, 593 U.S. at 392 ("Limiting damage and loss in this way makes sense in a scheme aimed at preventing the typical consequences of hacking.").

The parties only dispute whether Plaintiffs' allegations sufficiently plead the damage or loss element, but the Court will briefly note that the AC plausibly alleges in certain instances that Defendants' alleged actions amount to "access[] . . . without authorization" in light of *Van Buren v. United States*. 593 U.S. at 389. The Supreme Court held in *Van Buren* that "'without authorization' refers to whether 'one either can or cannot access a computer system,' and 'exceeds authorized access' refers to whether 'one either can or cannot access certain areas within the system.'" *United States v. Cuomo*, 125 F.4th 354, 363 (2d Cir.) (quoting *Van Buren*, 593 U.S. at 390), *cert. denied*, 146 S. Ct. 146 (2025), *reh'g denied*, No. 24-7372, 2026 WL 79768 (U.S. Jan. 12, 2026). After *Van Buren*, a person is not "exceeding authorized access" under the CFAA if they access information simply for an improper purpose or in violation of a contractual or other duty-based obligation not to access that information, as opposed to hacking into a computer system to which they already have some access to further access off-limits information. *See Van Buren*, 593 U.S. at 396. *Van Buren*'s holding, however, left open the question of whether "without authorization" similarly turns only on technological limits to access or whether it also included contractual or policy-based limitations to access. *Cuomo*, 125 F.4th at 364 (citing *Van Buren*, 593 U.S. at 390 n.8). Since *Van Buren*, courts within the Second Circuit have observed that a current employee who has access to information in their employer's computer system does not "exceed authorized access" if they access files for an improper purpose – such as starting up a competitor business – while still employed, but does access information "without authorization" if that access occurs after they have been fired or left the company. *See, e.g.*, *United Rentals, Inc. v. Wilper*, 626 F. Supp. 3d 546, 551-52 (D. Conn.

2022); *Zap Cellular, Inc. v. Weintraub*, No. 15-CV-6723, 2022 WL 4325746, at \*7 (E.D.N.Y. Sept. 19, 2022); *Redcell Corp. v. A.J. Trucco, Inc.*, No. 20-CV-18, 2022 WL 683007, \*5 (S.D.N.Y. Mar. 8, 2022).

Here, the AC includes allegations of improper access while Defendants were still employed at Plaintiffs' business or of improper access without specifying when it occurred. (*See* AC ¶¶ 106, 124). The AC does not allege that Defendants' access to the computer systems while working for Plaintiffs was somehow technologically limited and that Defendants had to hack their way into accessing files. Thus, the AC does not state a CFAA claim for the period that Defendants were still employed with Plaintiffs. But the AC also alleges that Defendants continued to access information on Plaintiffs' computers after they departed the company and that they destroyed some of that information. (*See* AC ¶¶ 96, 98, 153). Those allegations concerning Defendants' access after they were no longer employees could state a CFAA claim.[12]

Specifically, the AC alleges that Defendant Stern continued to access and then deleted "hundreds, if not thousands" of confidential business records on one of Plaintiffs' computers after Stern was no longer employed by Plaintiffs. (*Id.* ¶ 96.) Moreover, when Stern returned the computer to Plaintiff Zahler, he "had deleted all of Plaintiffs' data. The laptop was completely erased." (*Id.* ¶ 98.) Additionally, Plaintiffs allege that one or more of Defendants, though Plaintiffs do not know who, "deleted hundreds or thousands of emails and documents from Plaintiffs' email server" and that much of the information was deleted after all Defendants had ceased working for Plaintiffs. (*Id.* ¶ 153.) Plaintiffs allege that as a result, they suffered "at least

---

[12] The AC also alleges that Defendants' actions underlying the CFAA claim include refusing to return Plaintiffs' devices and password after Defendants were no longer working for Plaintiffs. (AC ¶¶ 92-93, 99, 316.) These allegations cannot state a claim under the CFAA, although they "might give rise to one or more common law causes of action." *See JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 525 (S.D.N.Y. 2013).

$250,000, in both lost revenues and consequential damages as well as costs incurred, including, but not limited to, the expenditures of resources in restoring some of the infrastructure, data, programs and other information damaged or lost." (*Id.* ¶ 322.)

Defendants argue that Plaintiffs have failed to specify particular losses from the unauthorized access that exceed $5,000, and that courts routinely dismiss such conclusory, speculative, nonspecific allegations. (Stern Mem. at 13.) Plaintiffs analogize their claim to that in *Broidy v. Global Risk Advisors LLC*, (*see* Opp. to Stern Mem. at 24), where a court in this district denied a motion to dismiss when the plaintiffs alleged:

> "losses associated with identifying and investigating the cyberattacks, and assessing and repairing the integrity and security of Plaintiffs' servers, systems and operations after the attacks, including the costs of forensic investigators, data security experts, and attorneys." The [Second Amended Complaint ("SAC")] also alleges losses associated with remedial measures, including "the replacement costs for personal and business computers and cell phones," and "consultant fees to reprogram Plaintiffs' new computer and cell phone equipment to create dual authentication systems." Finally, the SAC alleges that the total amount of losses "far exceeds $75,000" and that "out-of-pocket costs paid to outside consultants to conduct a damage assessment for remedial measures was alone in the hundreds of thousands of dollars."

2023 WL 6258135, at *10 (quoting *Broidy* plaintiffs' SAC). Plaintiffs' allegations are a far cry from those in *Broidy*. They do not specify what was deleted or describe the underlying value of the deleted data to their computer system, nor do they set forth any details as to the alleged "expenditures of resources in restoring" their computer system. (AC ¶ 322.) Plaintiffs' conclusory assertion that they expended resources to restore their systems and data is not enough to allege "loss" under the CFAA. *See Reis, Inc. v. Lennar Corp.*, No. 15-CV-7905, 2016 WL 3702736, at *6 (S.D.N.Y. July 5, 2016) (conclusory statement that plaintiffs "expended time, money, and resources (aggregating at least $5,000 in value) to conduct an investigation into the intrusion and a damages assessment" was insufficient). And without allegations "as to the significance of the documents that were allegedly edited or deleted" and "how or why" the

computer's system and data were impaired, the AC does not plausibly allege "damage" under the CFAA. *William Gottlieb Mgmt. Co., LLC v. Carlin*, No. 20-CV-8907, 2024 WL 1311854, at *4 (S.D.N.Y. Mar. 26, 2024). Even though the AC alleges that the computer that Defendant Stern returned "was completely erased," (AC ¶ 98), the losses and damages required to support a CFAA claim "must be harm to computers or networks, not economic harm due to the commercial value of the data itself." *Run the World Inc. v. Jiang*, No. 23-CV-3130, 2024 WL 3642185, at *3 (N.D. Cal. Aug. 2, 2024) (dismissing a similarly conclusory allegation); *see Better Holdco, Inc. v. Beeline Loans, Inc.*, No. 20-CV-8686, 2021 WL 3173736, at *4 (S.D.N.Y. July 26, 2021) ("In assessing whether certain costs are properly considered the 'cost of responding to an offense,' 18 U.S.C. § 1030(e)(11), courts in this District focus on the connection between the plaintiff's response and damage to or impairment of the protected device."); *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 19-CV-6793, 2021 WL 535217, at *6 (E.D.N.Y. Feb. 12, 2021) ("The value of stolen intellectual property is not counted towards the CFAA's damage and loss calculation. . . . [T]he statute reaches only those losses emanating more directly from the computer intrusion itself: the cost of investigating the intrusion and patching and repairing the system."), *aff'd*, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022); *Bros. Media Grp., LLC v. Sanders*, No. 17-CV-1111, 2018 WL 3029061, at *3 (M.D. Fla. May 30, 2018) (court could not reasonably infer $5,000 in loss – "*i.e.* reasonable costs including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense" – from allegation that computer was wiped clean), *report and recommendation adopted*, 2018 WL 3020021 (M.D. Fla. June 18, 2018). The AC does not specify any harm to the computer or its code. *See Turret Labs USA*, 2021 WL 535217, at *6. Plaintiffs' allegations are closer to those in *CourtAlert.com, Inc.*

32

*v. American LegalNet, Inc.*, where another court in this district dismissed a claim that simply alleged "that [plaintiff] incurred damages associated with investigating and responding to the unauthorized access." *See* No. 20-CV-7739, 2023 WL 6385964, at *9 (S.D.N.Y. Sept. 29, 2023). Without specific facts as to how Defendants' actions impaired Plaintiffs' computer systems or how Plaintiffs responded, Plaintiffs have not plausibly alleged sufficient damage or loss cognizable under the CFAA to state a claim.[13]

Accordingly, Defendants' motion to dismiss Plaintiffs' CFAA claim (Count XVIII) is GRANTED.

### D.    Remaining Claims

#### 1.    Claims against Werzberger

Defendant Werzberger did not move to dismiss the AC, nor did Werzberger join the other Defendants' motions. Instead, Werzberger filed an answer to the AC and asserted as an affirmative defense that Plaintiffs had failed to state a claim. (*See* ECF No. 37 at 3.) The Court, however, dismisses the federal claims against Werzberger *sua sponte*.

A court has inherent authority to dismiss a complaint on its own motion for failure to state a claim. *Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994), *abrogated on other grounds as recognized in Murphy v. Hughson*, 82 F.4th 177 (2d Cir. 2023); *see Catzin v. Thank*

---

[13] Moreover, Defendants correctly note that although Plaintiffs allege that Defendants' actions caused $250,000 in damage and loss collectively, some portion of that amount is attributed to damages stemming from actions that do not state a claim under the CFAA. (Stern Mem. at 13.) By lumping together their alleged loss in one conclusory paragraph, (AC ¶ 322), Plaintiffs include amounts that are not recoverable in their allegation of CFAA loss. They make no effort to differentiate, for example, losses from non-actionable access that occurred while the individual Defendants were still employed or non-recoverable losses from the commercial value of the data, if any. The aggregate nature of the allegation, combined with its wholly conclusory character, makes it impossible to reasonably infer that CFAA's loss requirement is met.

*You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018) ("[I]n certain circumstances a *sua sponte* dismissal may be appropriate . . . ."). *Sua sponte* dismissal can be proper where a plaintiff has "had notice and a full opportunity to make out his claim." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990). District courts within the Second Circuit have dismissed claims against a non-moving defendant where the plaintiffs had notice and an opportunity to defend those claims because they opposed dismissal of substantially similar claims against moving defendants and the same arguments would warrant dismissal as to the non-moving defendant. *See, e.g.*, *Reiner v. Paneth*, No. 24-CV-4914, 2025 WL 2783246, at *1 n.1 (E.D.N.Y. Sept. 30, 2025); *United States ex rel. Ranasinghe v. Ocwen Loan Servicing LLC*, No. 20-CV-2890, 2025 WL 788663, at *9 (E.D.N.Y. Mar. 12, 2025); *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 194-95 (S.D.N.Y. 2020), *aff'd in part, appeal dismissed in part sub nom. K.M. v. Adams*, No. 20-4128, 2022 WL 4352040 (2d Cir. Aug. 31, 2022) (summary order); *Odyssey Re (Lond.) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 288 n.4 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) (summary order).

Plaintiffs here have had ample opportunity to be heard on their claims, including filing a response to Defendants' pre-motion letters, attending a pre-motion conference, filing an amended complaint, and submitting opposition memoranda to Defendants' motions. (*See* ECF No. 34; Minute Entry dated Dec. 6, 2025; AC; Opp. to Stern Mem.; Opp. to Roth Mem.) Additionally, the claims against Werzberger do not differ in any meaningful way from the claims against the other Defendants. The portion of the AC that levies specific allegations against Werzberger includes only two examples that could possibly support the claims that the Court has addressed. (*See* AC ¶¶ 34, 41, 125-134.) First, the AC alleges that Werzberger "retained Plaintiffs' laptop after he left and when he finally returned the laptop all of the data on it was

34

deleted." (AC ¶ 127.)  This allegation is substantially similar to the allegation against Stern brought under Plaintiffs' CFAA claim.  (*See* AC ¶¶ 96, 98.)  For the same reasons discussed in Part III.C, this allegation does not provide sufficient detail as to how Werzberger's actions allegedly damaged or caused losses to Plaintiffs' computer systems in excess of the statutorily required amount, as necessary to plausibly allege a CFAA claim.  Second, the AC alleges that "Werzberger refuses to return one of Plaintiffs' email accounts despite repeated requests by Zahler.  The email account contains Plaintiffs' trade secrets and other confidential information." (AC ¶ 128.)  For the same reasons discussed in Part III.B, this allegation does not support a claim under the DTSA because it does not provide sufficient detail as to the information in issue, as necessary to plausibly allege that a trade secret exists.

Accordingly, the federal claims (Counts I, IV and XVIII) against Werzberger are dismissed *sua sponte* for the same reasons the Court dismisses the corresponding claims against the other Defendants.

### 2.    State Law Claims

Remaining are state law claims that Plaintiffs assert against Defendants for trademark infringement and dilution, misappropriation of confidential information, breaches of fiduciary duty and breaches of contract, unfair competition, unjust enrichment, diversion of corporate opportunity, tortious interference with business expectancy, conversion and accounting (Counts II-III and V-XVII).  (AC ¶¶ 167-80, 202-314.)  In the absence of diversity of citizenship, Plaintiffs assert that the Court should exercise supplemental jurisdiction to hear these claims pursuant to 28 U.S.C. § 1367.  (*See id.* ¶ 14).  The Court declines to do so.

For a district court to decline to exercise its supplemental jurisdiction over a claim related to a claim within its original jurisdiction, one of four scenarios set forth in 28 U.S.C. § 1367(c)

must be present.  *Catzin*, 899 F.3d at 85.  Here, 28 U.S.C. § 1367(c)(3) is applicable, as "'the district court has dismissed all claims over which it has original jurisdiction.'"  *See Catzin*, 899 F.3d at 85 (quoting 28 U.S.C. § 1367(c)(3)).  Even when one of these categories applies, however, the district court should decline its supplemental jurisdiction only upon balancing "the traditional 'values of judicial economy, convenience, fairness, and comity.'"  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see Catzin*, 899 F.3d at 85-86 ("The declining of supplemental jurisdiction must actually promote those values. . . .  [T]he district court must . . . meaningfully balance the supplemental jurisdiction factors.").  These factors generally weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial, *Kolari*, 455 F.3d at 122, but that alone cannot satisfy the inquiry, *see Catzin*, 899 F.3d at 86.

The instant case, although initiated in July 2024, (*see* ECF No. 1), is far from trial.  The Court has not previously decided any issues on the merits and discovery has not begun.  *See Tojek v. Harris*, No. 19-CV-1470, 2022 WL 976941, at *3 (W.D.N.Y. Mar. 31, 2022) (declining to exercise supplemental  jurisdiction when a case is "in its nascent stages . . . [and] a long way from trial"); *24 Seven*, 2021 WL 276654, at *10 ("Concerns about judicial economy, convenience, and fairness are limited because discovery is not yet underway and a trial date has not been set.").  It is unlikely Plaintiffs will be prejudiced because the limitations period is tolled for state law claims first asserted in federal court under supplemental jurisdiction and then dismissed.  *See Smith v. AECOM Tishman*, No. 21-CV-2915, 2025 WL 691662, *8 (S.D.N.Y. Mar. 4, 2025); *see also Artis v. District of Columbia*, 583 U.S. 71, 74-75 (2018) (state limitations periods for claims in federal court under supplemental jurisdiction statute are held in abeyance

during pendency of federal suit).[14]  Comity, which takes into account the nature of the claims and

the relationship between the federal and state systems' functions, would be served because the

only claims left arise under state law and because the AC includes allegations that cases

involving these parties were also filed in New York State Supreme Court in New York County.

(AC ¶ 133.)[15]

Having determined that all the claims over which this Court has original jurisdiction

should be dismissed,[16] and having considered the above factors, the Court declines to exercise

---

[14] The Court is not faced with a situation like the one in *Catzin*, where the Second Circuit held that declining supplemental jurisdiction *sua sponte* on the eve of trial was an abuse of discretion in part because the parties had had no notice or opportunity to be heard.  *See Tojek*, 2022 WL 976941, at *3 n.4.  "[N]otice concerns are not present here where the court is faced with a motion to dismiss."  *Id.*; *see Catzin*, 899 F.3d at 84 ("In such situations, a district court need not provide a separate opportunity to be heard beyond the briefing and resolution of such motions.").

[15] In addition, the Court *sua sponte* takes judicial notice of the filing of a related complaint in New York State Supreme Court, Kings County.  *See Life's Fortune LLC v. Serenu, Inc.*, No. 507172/2025 (N.Y. Sup. Ct. filed March 3, 2025).

[16] Having dismissed Plaintiffs' Lanham Act claim, the Court lacks original jurisdiction over Plaintiffs' unfair competition and similar claims, 28 U.S.C. § 1338(b) notwithstanding.  Pursuant to § 1338(b), a district court "shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws."  Plaintiffs' state law trade dress claims, and their unfair competition claim to the extent it is relies on an infringement theory, are related to the Lanham Act claim.  But where a plaintiff's federal claims "under the copyright, patent, plant variety protection or trademark laws" have been dismissed, jurisdiction pursuant to § 1338 is discretionary, and subject to the same standard as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  *See LRC Elecs., Inc. v. John Mezzalingua Assocs., Inc.*, 974 F. Supp. 171, 176-77 (N.D.N.Y. 1997); *I. Appel Corp. v. Munsingwear, Inc.*, 646 F. Supp. 685, 689-90 (S.D.N.Y. 1986); *see also Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1571 n.14 (Fed. Cir. 1994) ("28 U.S.C. § 1338(b) is a codification of the doctrine of pendent jurisdiction as it applies to patent, trademark, and copyright causes of action.").  As a result, courts within this circuit have declined to exercise jurisdiction over state law unfair competition and trademark infringement claims after having dismissed a Lanham Act claim.  *See, e.g.*, *Down to Earth Organics, LLC v. Efron*, No. 22-CV-6218, 2024 WL 1376532, at *1, *9 (S.D.N.Y. Mar. 31, 2024) (declining to exercise jurisdiction over state unfair competition claim after Lanham Act claim dismissed); *Kelly-Brown v. Winfrey*, No. 11-CV-7875, 2012 WL 701262, at *1, *9

supplemental jurisdiction over Plaintiff's state law causes of action.  Accordingly, they are dismissed without prejudice.

### E.       Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint once, (ECF No. 36), after having the benefit of Defendants' pre-motion letters, (ECF Nos. 26-27), and the discussion at the pre-motion conference, (*see* Minute Entry dated Dec. 6, 2024).  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his

---

(S.D.N.Y. Mar. 6, 2012) (declining to exercise jurisdiction over state trademark infringement and unfair competition claims after dismissing Lanham Act claim), *aff'd in part, vacated in part*, 717 F.3d 295, 313-14 (2d Cir. 2013) (noting that district court declined jurisdiction over state claims, but reinstating them after finding district court erred in dismissing Lanham Act claim); *Bridgeman Art Libr., Ltd. v. Corel Corp.*, 25 F. Supp. 2d 421, 431 (S.D.N.Y. 1998) ("Inasmuch as [plaintiff] has no viable claims under the Copyright and Lanham Acts, jurisdiction over its unfair competition claims under Section 1338(b) fails."), *on reconsideration*, 36 F. Supp. 2d 191 (S.D.N.Y. 1999); *see also Hist. Truth Prods., Inc. v. Sony Pictures Ent., Inc.*, No. 93-CV-5529, 1995 WL 693189, at *13-14 (S.D.N.Y. Nov. 22, 1995) ("Because [plaintiff's] copyright claim has been dismissed, Section 1338 no longer confers jurisdiction over [the state unfair competition and misappropriation] claims."); *cf. A. H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 14, 19-20 (2d Cir. 1968) (district court did not abuse direction in exercising jurisdiction over state law unfair competition claim premised on misappropriation of trade secrets where claim was related to patent infringement claim and patent claim was not dismissed until middle of trial).

complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*."); *see also Baines v. Nature's Bounty (NY), Inc.*, No. 23-CV-710, 2023 WL 8538172, at *3 (2d Cir. Dec. 11, 2023) (no abuse of discretion in denying leave to amend where plaintiffs "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at *4 n.2 (S.D.N.Y. May 27, 2020) (dismissing with prejudice where plaintiff amended following pre-motion letters and pre-motion conference that identified the deficiencies resulting in dismissal).

Moreover, Plaintiffs have not asked to amend again or otherwise suggested that they are in possession of facts that would cure the deficiencies identified in this decision.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if [he] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at *21 (S.D.N.Y. Feb. 16, 2023) (denying leave to amend where plaintiff "already amended its

complaint in response to [Defendants'] pre-motion letter detailing the bases for its anticipated motion to dismiss" and did not seek leave to amend again).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## IV.    **CONCLUSION**

For the foregoing reasons, the motions are granted.  The trade dress infringement claim pursuant to the Lanham Act (Count I), the misappropriation of trade secrets claim pursuant to the DTSA (Count IV), and the CFAA claim (Count XVIII) are dismissed with prejudice.  The state claims for trade dress infringement and dilution, misappropriation of confidential information, breaches of fiduciary duty and breaches of contract, unfair competition, unjust enrichment, diversion of corporate opportunity, tortious interference with business expectancy, conversion and accounting (Counts II-III and V-XVII) are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 38-39, 46), and close the case.

**SO ORDERED.**

Dated: March 20, 2026
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

40